IN THE SUPREME COURT OF TENNESSEE
AT MEMPHIS
November 13, 2007 Session

## J. O. HOUSE v. ESTATE OF J. K. EDMONDSON

**Appeal by permission from the Court of Appeals, Western Section
Chancery Court for Shelby County
No. 99-0326-02 Arnold B. Goldin, Chancellor**

_____

**No.  W2005-00092-SC-R11-CV - Filed January 25, 2008**

_____

A minority shareholder in a closely held Tennessee corporation filed a derivative suit claiming that the company's majority shareholder, who also served as the corporation's president and chairman of its board of directors, misappropriated corporate funds.  The minority shareholder also filed an individual claim against the majority shareholder alleging that he breached a pre-incorporation agreement in which the majority shareholder agreed to offer available stock to the corporation and other shareholders before purchasing the stock himself.  A litigation committee appointed by the corporation to investigate the allegations against the majority shareholder found merit to the charges. The litigation committee recommended to the corporation that the company either settle the derivative claim or proceed with the litigation if the majority shareholder was unwilling to resolve the lawsuit in accordance with terms proposed by the committee.  The trial court found that the litigation committee's findings and recommendations were in the corporation's best interests and that, once a settlement was reached, the derivative suit would be dismissed.  The trial court also granted summary judgment to the majority shareholder on the individual breach of contract claim and denied the minority shareholder's request for attorney's fees.  The Court of Appeals affirmed the trial court's  acceptance of the litigation committee's report and the denial of attorney's fees to the minority shareholder, but reversed the trial court's grant of summary judgment to the majority shareholder on the breach of contract claim.  We accepted review to determine: (1) whether a plaintiff in a shareholder's derivative suit brought on behalf of a for-profit corporation may recover attorney's fees; and (2) whether the trial court was correct in adopting the findings of the litigation committee's report.  We hold that Tennessee law does not authorize an award of attorney's fees to a plaintiff in a shareholder's derivative suit brought on behalf of a for-profit corporation.  We also hold that the trial court did not err in approving the sufficiently independent, thoroughly researched report of the litigation committee.  Accordingly, the judgment of the Court of Appeals as to those issues is affirmed.

**Tenn. R. App. P. 11; Judgment of the Court of Appeals Affirmed**

CORNELIA A. CLARK, J., delivered the opinion of the court, in which WILLIAM M. BARKER, C.J., and JANICE M. HOLDER and WILLIAM C. KOCH, JR., JJ., joined. GARY R. WADE, J., dissenting.

Tim Edwards, Memphis, Tennessee, and Kent J. Rubens, West Memphis, Arkansas, for the appellant, J. O. House.

Jef Feibelman, Memphis, Tennessee, for the appellee, Estate of J. K. Edmondson.

John McQuiston, II, Memphis, Tennessee, for the intervenor, Ram-Tenn, Inc.

James G. Stranch, III, Michael J. Wall, and Joe P. Leniski, Nashville, Tennessee, for the Amicus Curiae, The Plumbers and Pipefitters Local 572 Pension Fund.

**OPINION**

**Factual and Procedural Background**

This appeal arises out of a derivative action initiated in the Chancery Court for Shelby County on behalf of Ram-Tenn, Inc. ("Ram-Tenn"), a closely held Tennessee corporation, by J. O. House, a minority shareholder of Ram-Tenn. The suit was filed against the corporation's majority shareholder, J. K. Edmondson, alleging that Edmondson had misappropriated corporate funds for his personal use. The plaintiff sought monetary damages and injunctive relief against Edmondson on behalf of Ram-Tenn. Ram-Tenn intervened in the lawsuit.

In 1968, the plaintiff and Edmondson, along with seven other individuals, formed Ram-Tenn for the purpose of building, buying, and managing hotels and restaurants. At the time Ram-Tenn was formed, Edmondson owned 25% of the company's stock. By 1988, Edmondson was the majority shareholder, owning 62% of the company's stock. He was also the president of Ram-Tenn and chairman of its board of directors. The plaintiff, a minority shareholder of Ram-Tenn since its inception, owned 5% of the company's stock. There is no dispute that Ram-Tenn has been controlled by Edmondson throughout its corporate existence.

In 1997, the plaintiff examined Ram-Tenn's financial records and discovered that Edmondson had been misusing corporate funds. The plaintiff discovered, for example, that Edmondson had used corporate money to pay insurance premiums for another business that he owned, tuition for an individual attending college, and various personal expenses. The plaintiff also discovered that Edmondson had used Ram-Tenn funds to make contributions to a church and had used another corporation in which he had an ownership interest to bill Ram-Tenn for products and services at inflated prices.

-2-

Following the discovery of Edmondson's misuse of corporate funds, the plaintiff, on April 12, 1999, filed this shareholder derivative action against Edmondson alleging that he had violated his fiduciary obligations to Ram-Tenn. The complaint, which sought monetary damages as well as injunctive relief, claimed that Edmondson's actions caused minority stockholders to suffer a decrease in the value of their investments. In addition to the derivative suit, the plaintiff filed a claim against Edmondson for breaching a pre-incorporation agreement in which Edmondson agreed to offer available shares of stock to the corporation and other shareholders before buying the stock himself. See Hall v. Tenn. Dressed Beef Co., 957 S.W.2d 536, 540 (Tenn. 1997) (holding that shareholders may bring derivative and individual claims simultaneously). Ram-Tenn subsequently intervened in the lawsuit and became a party.

In response to the plaintiff's suit, Ram-Tenn's board of directors appointed a Memphis lawyer, Michael McLaren, to serve as a one-person litigation committee to investigate the plaintiff's allegations against Edmondson. The board charged McLaren, who had no affiliation with Ram-Tenn or any of the parties, with the responsibility of determining how the corporation should respond to the suit. Ram-Tenn's specific charge to McLaren was to use his "independent business judgment to determine whether, in the best interest of the corporation, the litigation should be continued, dismissed, or settled."

After conducting an investigation with the assistance of an accounting firm, McLaren issued an initial report and then a supplemental report concluding that Edmondson had misappropriated $552,501 from Ram-Tenn for his personal use. McLaren recommended to the corporation that the parties settle the lawsuit for that amount to avoid the expense of further litigation. Specifically, McLaren recommended that Edmondson pay Ram-Tenn $552,501, which the corporation would distribute to shareholders according to their ownership interests, less any amounts that shareholders chose to waive.[1] McLaren further recommended that if the parties were unwilling to settle, Ram-Tenn should pursue the derivative claim against Edmondson. Ram-Tenn moved the trial court to accept McLaren's report. See Tenn. Code Ann. § 48-17-401(c) (2002) (a derivative suit "may not be discontinued or settled without the court's approval").[2]

Following multiple hearings in which the plaintiff, McLaren, and others testified, the trial court, on January 16, 2004, approved McLaren's report recommending that the case be settled by Edmondson paying Ram-Tenn $552,501. The trial court found that McLaren's findings and recommendations were in the corporation's best interests and that, once a settlement was reached,

---

[1]Ninety percent of such payments were eventually waived by Ram-Tenn's shareholders. It should also be noted that Ram-Tenn's principal asset, a hotel in Nashville, was sold for $3,400,000 before McLaren's reports were issued. McLaren described the company in his reports as "nonfunctioning." The company is apparently in wind-up mode pending the conclusion of this litigation.

[2]Because the language of the cited statutes has not changed from the version in effect in 1998, the year this suit commenced, we cite to the most recent edition.

the derivative suit would be dismissed.[3]  The trial court also directed that any funds paid by Edmondson as part of the settlement be placed in escrow pending any appeal.  Finally, the trial court granted summary judgment to Edmondson on the plaintiff's individual claim that Edmondson had breached a pre-incorporation agreement.  Accordingly, the trial court found that Edmondson properly owned 62% of Ram-Tenn's stock.

While the case was pending in the trial court, the plaintiff requested that attorney's fees be awarded to him on the theory that the derivative suit against Edmondson had benefitted the corporation.  The trial court and the Court of Appeals declined to award attorney's fees based on the principle that litigants must pay their own attorney's fees absent a statute or an agreement providing otherwise.  The courts below reasoned that the statutes governing for-profit corporations such as Ram-Tenn do not provide for an award of attorney's fees to a shareholder bringing a derivative action.  The Court of Appeals further concluded that the trial court properly approved McLaren's report.  However, the Court of Appeals, in a divided decision, reversed the grant of summary judgment to Edmondson on the plaintiff's individual breach of contract claim.  With respect to this claim, the intermediate court found that there were disputed issues of fact concerning the plaintiff's knowledge of Edmondson's acquisition of additional stock for statute of limitations purposes.  This part of the intermediate court's decision–which remanded the case for a determination of whether the plaintiff's breach of contract claim was timely–has not been challenged in this Court.  Thus, the plaintiff's individual claim against Edmondson is not before us.[4]

**Analysis**

I.  Attorney's Fees

The primary issue before us is whether a plaintiff in a shareholder's derivative suit brought on behalf of a for-profit corporation may recover attorney's fees.  The trial court found that Tennessee law does not provide for an award of attorney's fees to a plaintiff in a derivative suit involving a for-profit company.  The Court of Appeals agreed, holding that the statutes governing for-profit corporations do not contemplate an award of attorney's fees to a plaintiff.  The intermediate court further concluded that attorney's fees were not available under the common fund doctrine.  We agree.

We begin our analysis of this issue by noting that Tennessee, like most jurisdictions, adheres to the "American rule." John Kohl & Co. v. Dearborn & Ewing, 977 S.W.2d 528, 534 (Tenn. 1998).  The American rule provides that a party in a civil action may not recover attorney's fees absent a

---

[3]The parties' briefs indicate that the derivative suit has in fact been settled subject to the approval of the trial court and the outcome of this appeal.

[4]Edmondson passed away in December 2006 while the case was pending in the Court of Appeals.  Upon motion of the parties, this Court substituted Edmondson's estate as the proper party.

specific contractual or statutory provision providing for attorney's fees as part of the prevailing party's damages. Id.

The American rule, which has been described by this Court as "firmly established in this state," State v. Brown & Williamson Tobacco Corp., 18 S.W.3d 186, 194 (Tenn. 2000), is based on several public policy considerations. First, since litigation is inherently uncertain, a party should not be penalized for merely bringing or defending a lawsuit. Fleischmann Distilling Corp. v. Maier Brewing Co., 386 U.S. 714, 718 (1967), *superseded by statute on other grounds*, Act of Jan. 2, 1975, Pub. L. No. 93-600, 88 Stat. 1955. Second, the poor might be unjustly discouraged from instituting actions to vindicate their rights if the penalty for losing included paying the fees of their opponent's lawyer. Id. Third, requiring each party to be responsible for their own legal fees promotes settlement. Allstate Ins. Co. v. Huizar, 52 P.3d 816, 818 (Colo. 2002). Fourth, the time, expense, and difficulty inherent in litigating the appropriate amount of attorney's fees to award would add another layer to the litigation and burden the courts and the parties with ancillary proceedings. Fleischmann, 386 U.S. at 718. Thus, as a general principle, the American rule reflects the idea that public policy is best served by litigants bearing their own legal fees regardless of the outcome of the case.

As with most rules, however, there are exceptions to the American rule. One of these exceptions is the common fund doctrine. The common fund doctrine provides that attorney's fees may be awarded when the efforts of a litigant succeeds in "securing, augmenting, or preserving property or a fund of money in which other people are entitled to share in common." Travelers Ins. Co. v. Williams, 541 S.W.2d 587, 589 (Tenn. 1976). In that event, the beneficiaries of the fund or property may be required to contribute to the litigant's attorney's fees by having those fees assessed against the fund or property itself. Kline v. Eyrich, 69 S.W.3d 197, 204 (Tenn. 2002). Designed to spread attorney's fees among the various beneficiaries to the fund or property, the doctrine serves two important purposes.

> First, the doctrine prevents the beneficiaries of legal services from being unjustly enriched by requiring them to pay for those services according to the benefit received. Second, the doctrine serves to spread the costs of litigation proportionally among all of the beneficiaries so that the plaintiff does not bear the entire burden alone.

Id. (citations omitted).

Whether the common fund doctrine applies in a given case is a question of law for the court to decide. Id. at 203. Accordingly, the appropriate standard of review on appeal is de novo, according no presumption of correctness to the trial court's decision. Id. However, "upon finding that the common fund doctrine is applicable, '[t]he allowance of attorney's fees is . . . largely in the discretion of the trial court.'" Id. (first alteration in original) (quoting Aaron v. Aaron, 909 S.W.2d 408, 411 (Tenn. 1995)). Consequently, a trial court's award of fees will be upheld unless it has abused its discretion, "meaning that it either applied an incorrect legal standard or reached a clearly unreasonable decision" resulting in an injustice. Id. at 203-04.

A. Statutory Law

Guided by these principles, we turn to the precise issue before us–whether Tennessee law authorizes an award of attorney's fees to a plaintiff in a derivative suit brought on behalf of a for-profit corporation. At one time, Tennessee law clearly permitted such an award. In 1968, the legislature enacted Tennessee Code Annotated section 48-718, which provided for an award of attorney's fees to both plaintiffs and defendants. Under section 48-718(4), "[i]f the suit [brought on behalf of the corporation for profit] is successful, . . . the court may award the [plaintiff] reasonable expenses and reasonable attorneys' fees." This section went even further and provided that the court "shall declare a lien upon the recovery made by the corporation to secure the payment to the [plaintiff] and [the plaintiff's] attorneys of the amount thus awarded."[5] Tenn. Code Ann. § 48-718(4). Additionally, under section 48-718(5), if there was a finding "that the suit was brought without reasonable cause," the court "may require the [plaintiff] to pay to the party or parties named as defendant or defendants the reasonable expenses, including fees of attorneys, incurred by them in the defense of such suit."

In 1986, the General Assembly updated Tennessee's corporation statutes. In the process of doing so, the General Assembly considered the revised Model Business Corporation Act of 1984 (MBCA). See Kradel v. Piper Industries, Inc., 60 S.W.3d 744, 749 (Tenn. 2001). Like the already-existing Tennessee statute, section 48-718, the MBCA specifically provided for the recovery of attorney fees by both successful plaintiffs and defendants. See Model Bus. Corp. Act § 7.46(1) ("On termination of the derivative proceeding the court may . . . order the corporation to pay the plaintiff's reasonable expenses (including counsel fees) incurred in the proceeding . . . ."); Model Bus. Corp. Act § 7.46(2) ("On termination of the derivative proceeding the court may . . . order the plaintiff to pay any defendant's reasonable expenses (including counsel fees) incurred in defending the proceeding . . . ."). Thus, the General Assembly, in revising Tennessee's corporation statutes, had before it two clear methods to allow successful plaintiffs to continue to have the ability to receive attorney's fees in shareholder derivative suits; the legislature could either have (1) adopted the language of section 7.46(1) of the MBCA or (2) reincorporated existing section 48-718 into the updated legislation.

However, the Tennessee Business Corporation Act of 1986 (TBCA), as adopted by the legislature and codified at Tennessee Code Annotated sections 48-11-101 to -27-103 (2002 & Supp. 2006), does not include language similar to that found in either Tennessee Code Annotated section 48-718(4) or section 7.46(1) of the MBCA. Instead, in enacting the TBCA, the legislature repealed

---

[5]Although by its terms section 48-718 applied to for-profit corporations, it was construed by the Court of Appeals to apply to not-for-profit corporations as well. See Hannewald v. Fairfield Cmtys., Inc., 651 S.W.2d 222 (Tenn. Ct. App. 1983). In Hannewald, the intermediate court, in awarding attorney's fees to a derivative plaintiff, reasoned that attorney's fees were necessary in shareholder derivative suits "to encourage and assist shareholders . . . in pursuing justified claims for the benefit of corporations in which they have a valid interest." Id. at 230.

section 48-718[6] in its entirety and chose not to include all of the suggested language found in the MBCA. As the TBCA was written in 1986 and as it reads today, there is no corresponding provision to either 48-718(4) or 7.46(1) in the act allowing a successful *plaintiff* to recover attorney's fees. Instead, the legislature adopted what is now Tennessee Code Annotated section 48-17-401(d), which limits the recovery of attorney's fees in derivative actions to only successful *defendants*. Thus, section 48-718 was expressly repealed and replaced with a provision that contemplates an award of attorney's fees to a *defendant* if the derivative suit has no factual or legal basis, but no provision entitling *plaintiffs* to attorney's fees, as the former statute did. For whatever reason, the General Assembly specifically chose not to include such a provision.

Accordingly, it is apparent to us that the legislature affirmatively considered and determined the circumstances in which attorney's fees may be awarded in a shareholder derivative suit. Moreover, the General Assembly's decision not to include plaintiffs in section 48-17-401(d) may not be interpreted as silence on the issue. That body replaced a statute that permitted successful plaintiffs and defendants to recover attorney's fees in a derivative action with a statute permitting only successful defendants to recover attorney's fees. While the dissent views this course of action as "legislative silence," we do not. This Court has stated that a change in the law by statute raises a presumption that a departure from the old law was intended, State v. Turner, 193 S.W.3d 522, 527 (Tenn. 2006), and not merely an omission or mistake on the part of the legislature. While we, like the drafters of the MBCA, might see merit in permitting successful plaintiffs in a derivative action to recover attorney's fees, it is not for this Court to question the wisdom of this statutory scheme. Instead, we are to construe and apply the law as written. See Carson Creek Vacation Resorts, Inc. v. Dept. of Revenue, 865 S.W.2d 1, 2 (Tenn. 1993). Therefore, we conclude that the controlling statutes simply do not provide for an award of attorney's fees to derivative plaintiffs in actions involving for-profit corporations. Although the dissent essentially urges us to do so, we decline to resurrect judicially a repealed statute, no matter how equitable it might seem to do so. See McBrayer v. Dixie Mercerizing Co., 144 S.W.2d 764, 768 (Tenn. 1940) (holding that courts "cannot, of course, under the guise of construction amend or alter [statutes]").

B. Case Law

The plaintiff and the amicus curiae maintain, and the dissent agrees, that even in the absence of statutory authority for an award of attorney's fees, such fees should be recoverable under the common fund doctrine because successful derivative suits confer a benefit upon the corporation. They rely upon Grant v. Lookout Mountain Co., 28 S.W. 90 (Tenn. 1894), which held that attorney's fees may be awarded to a plaintiff in a shareholder derivative action. Id. at 93. The problem with the plaintiff's reliance upon Grant, however, is that the case was decided nearly a century before the adoption of the Tennessee Business Corporation Act, which plainly sets out the type of cases in which attorney's fees may be awarded. See Tenn. Code Ann. § 48-17-401(d). Cases such as the present one are not among those included in the statutes governing for-profit corporations. Thus,

---

[6]In 1984, section 48-718 was renumbered as section 48-1-718. Sections 48-1-701 to -721 were repealed by the TBCA. See Tenn. Code Ann. §§ 48-1-701 to -721, *repealed* (2002).

Grant has been abrogated by subsequent changes in the law and, as such, does not compel the result urged by the plaintiff and the amicus.[7]

The plaintiff and the amicus also rely upon an unreported case, McRedmond v. Estate of Marianelli, No. M2004-01496-COA-R3-CV, 2006 WL 2805158 (Tenn. Ct. App. Sept. 29, 2006). In that case, the trial court in a shareholder's derivative action awarded attorney's fees against a Kentucky company pursuant to Kentucky's common fund doctrine. The issue in McRedmond, as framed by the parties, was whether the trial court "erred in its application of the Kentucky common fund doctrine in ordering [the Kentucky corporation] to pay the attorneys' fees and expenses of the [] derivative plaintiffs." Id. at *7. In affirming the trial court's award of fees, the Court of Appeals noted that "[t]he applicable law in this case is Kentucky law." Id. at *4. Despite the intermediate court's declaration that Kentucky law governed, however, the court went on to state that the question before it was "whether the common fund doctrine (either under Tennessee or Kentucky law) applies under the facts of this case. We find that it does." Id. at *20. Regardless of which state's law was actually applied in McRedmond, that case is not dispositive of the present case. To the extent that McRedmond may be construed to conflict with our decision today, it is overruled.

Finally, the plaintiff and the amicus rely upon Hannewald where, as noted, the Court of Appeals, in awarding attorney's fees to a plaintiff in a shareholder derivative suit, reasoned that attorney's fees were necessary "to encourage and assist shareholders . . . in pursuing justified claims for the benefit of corporations in which they have a valid interest." Hannewald, 651 S.W.2d at 230. Citing Hannewald, the plaintiff and amicus argue that disallowing attorney's fees to plaintiffs will chill shareholder derivative litigation because minority shareholders lack the practical means to hold corporate fiduciaries accountable for their actions. They assert that contingency fee arrangements would serve no beneficial purpose because the corporation itself, not the client, would receive any proceeds of the litigation, and that few clients would have the financial means to pay an hourly fee. It seems to us that while these arguments are not unreasonable given the complex nature of derivative litigation, their merits should be addressed by the legislature, for that body has made a policy choice to depart from former law providing for attorney's fees in cases involving for-profit

---

[7]The dissent argues that Grant remains viable despite the repeal of section 48-718. Relying on Tucson Gas & Electric Co. v. Schantz, 428 P.2d 686, 690 (Ariz. Ct. App. 1967), and Lavin v. Jordan, 16 S.W.3d 362, 368 (Tenn. 2000), the dissent asserts that a common law rule is not explicitly abrogated by statute unless the statute clearly reflects legislative intent to do so. As we see it, however, the abrogation of the common law, as reflected in Grant, was explicit and intended by the legislature. In 1968, the General Assembly subsumed the common law common fund doctrine into section 48-718. Subsequently, when the TBCA was passed in 1986, section 48-718 was explicitly rejected by the legislature when not included into the new Act. "As a general rule of statutory construction, a change in the language of the statute indicates that a departure from the old language was intended." Lavin, 16 S.W.3d at 369. Therefore, in intentionally removing section 48-718, the General Assembly placed the common law rule at odds with the TBCA. And, as this Court has previously stated, "[w]hen there is a conflict between the common law and a statute, the provision[s] of the statute must prevail." Id. at 368 (quoting Graves v. Illinois Cent. R.R. Co., 148 S.W. 239, 242 (Tenn. 1912)).

corporations. Furthermore, we note that, like <u>Grant</u>, <u>Hannewald</u> predates the adoption of the Tennessee Business Corporation Act. Thus, <u>Hannewald</u> is of little avail to the plaintiff.

In sum, we hold that Tennessee law does not authorize an award of attorney's fees to a plaintiff in a shareholder's derivative suit involving a for-profit corporation. If the application of the relevant statute, namely section 48-17-401(d), produces an unfair or unintended result,[8] the answer lies in changing the statute.

## II. Litigation Committee's Report

Following multiple hearings in which the plaintiff, McLaren, and others testified, the trial court, on January 16, 2004, approved McLaren's report recommending that the case be settled by Edmondson paying Ram-Tenn $552,501. <u>See</u> Tenn. Code Ann. § 48-17-401(c) (derivative suits "may not be discontinued or settled without the court's approval"). The trial court found that McLaren's findings and recommendations were in the corporation's best interests and that, once a settlement was reached, the derivative suit would be dismissed. If the case failed to settle, the derivative action would proceed.

The plaintiff maintains that the trial court erred in approving McLaren's report. According to the plaintiff, McLaren improperly limited his investigation of Edmondson's activities to four years prior to the filing of the complaint. The plaintiff contends that had the investigation been broadened by going back further McLaren would have discovered larger sums misappropriated by Edmondson. The plaintiff also asserts that McLaren's report should have been rejected by the trial court because his conclusions and recommendations were the product of an inadequate investigation. Resolving these issues requires that they be viewed in the context of certain well-established principles.

Generally, "the proper party to bring a claim on behalf of a corporation is the corporation itself acting through its directors or a majority of its shareholders." <u>Daily Income Fund, Inc. v. Fox</u>, 464 U.S. 523, 531-32 (1984). However, since at least 1874, the courts of this state have been available to enforce the rights of corporations and their stockholders through what is called a derivative action. <u>See</u> <u>Deaderick v. Wilson</u>, 67 Tenn. (1 Heisk.) 108 (1874). A derivative action is a suit brought by one or more shareholders on behalf of a corporation to redress an injury sustained by, or to enforce a duty owed to, the corporation. <u>See</u> <u>Bourne v. Williams</u>, 633 S.W.2d 469, 471 (Tenn. Ct. App. 1981). Thus, a derivative action is an exception to the rule that the corporation itself is the proper party to bring suit on its own behalf.

Tennessee, like other jurisdictions, has approved a corporation's appointment of an independent individual or group, called a special litigation committee, as a mechanism for assessing the merits of a shareholder's derivative action and for making recommendations to the corporation concerning its resolution. <u>See</u> <u>Lewis v. Boyd</u>, 838 S.W.2d 215, 222-24 (Tenn. Ct. App. 1992). As

---

[8]Plaintiff's counsel has suggested to this Court that the omission of attorney's fees for plaintiffs in section 48-17-401 was due to "bad drafting."

our courts have recognized, these litigation committees "provide a legitimate vehicle for expressing a corporation's interest in derivative litigation." Id. at 223. Given that a shareholder derivative action cannot be dismissed or settled without court approval, Tenn. Code Ann. § 48-17-401(c), courts deciding whether to accept a litigation committee's recommendations consider a number of factors, including the committee's independence, good faith, procedural fairness, and the soundness of the committee's conclusions and recommendations. Lewis, 838 S.W.2d at 225. Although courts should critically evaluate the committee's findings and recommendations to determine whether they were made in good faith, are supported by the record of the investigation, and are consistent with the corporation's best interests, they should not substitute their own business judgment for that of the committee's. Id. at 224.

In this case, the plaintiff does not challenge Ram-Tenn's decision to appoint McLaren to serve as a one-person litigation committee. Nor does the plaintiff challenge McLaren's independence or his good faith.[9] Rather, the plaintiff's arguments for rejecting McLaren's report center on whether McLaren acted with procedural fairness and whether his conclusions and recommendations were the product of an inadequate investigation.

As to the procedure employed by McLaren, the plaintiff argues that McLaren improperly restricted the scope of his review of Ram-Tenn's records to 1994–four years prior to the filing of the complaint. In deciding to limit his inquiry to the period 1994 forward, McLaren applied the three-year statute of repose found at Tennessee Code Annotated section 48-18-601, which governs actions alleging a breach of fiduciary duty by a director or officer of a corporation. That statute adopts a one-year statute of limitations for such claims, but provides that "[i]n no event shall any such action be brought more than three (3) years after the date on which the breach or violation occurred, except when there is fraudulent concealment on the part of the defendant, in which case the action shall be commenced within one (1) year" after the breach is or should have been discovered. Tenn. Code Ann. § 48-18-601 (2002). McLaren, relying upon section 48-18-601 in framing the scope of his investigation, applied a three-year statute of repose and added an additional year for any fraudulent concealment that may have occurred.[10] The plaintiff maintains that McLaren should have broadened

---

[9] In evaluating the independence of a litigation committee, courts consider factors such as the size of the committee, the committee members' relationship with the corporation's officers and directors, their qualifications and experience, the scope of the committee's authority, and the committee's autonomy from the officers and directors. Lewis, 838 S.W.2d at 224. It is undisputed in this case that McLaren had no affiliation with Ram-Tenn or any of the parties when Ram-Tenn appointed him. Further, it is undisputed that McLaren has been a licensed attorney for 26 years, focusing his practice in the area of commercial litigation.

[10] When questioned at trial as to why he added only one additional year for any fraudulent concealment that may have occurred, McLaren testified that he made a judgment call to limit the time period of the investigation to four years prior to the filing of the complaint because of the cost and practical difficulty of getting Ram-Tenn's records prior to that time. As he stated, Ram-Tenn had few records for the period prior to 1994, and it would have taken longer and been more costly to keep digging beyond four years. The evidence does not preponderate against these findings. Moreover, in the litigation committee report, McLaren stated:

(continued...)

the scope of his investigation even further by covering a ten-year period under Tennessee Code Annotated section 28-3-110 (2000), which provides that "cases not expressly provided for" must be commenced within ten years after the cause of action accrues. Alternatively, the plaintiff argues that McLaren should have broadened the scope of his investigation by covering a six-year period under Tennessee Code Annotated section 28-3-109 (2000), the limitations period applicable to breach of contract actions.

The plaintiff's argument that McLaren improperly limited the scope of his investigation into Edmondson's activities is unpersuasive. The legislature has clearly provided a limitations period applicable to cases of this type in section 48-18-601. Under its own terms, that statute applies to "[a]ny action alleging a breach of fiduciary duties by directors or officers" of a corporation. The present case falls squarely within the ambit of section 48-18-601. Therefore, the limitations periods set forth in sections 28-3-109 (six years for breach of contract) and 28-3-110 (ten years for cases "not expressly provided for") do not apply. Thus, we conclude, as the Court of Appeals did, that McLaren did not improperly limit the scope of his investigation.

The plaintiff also argues that McLaren's conclusions and recommendations are the product of an inadequate investigation and are inconsistent with the corporation's best interests. In considering this issue, we note that courts take into account several factors in determining the adequacy of a litigation committee's investigation. These factors include the length and scope of the investigation, the committee's use of independent experts, the corporation's or the defendant's involvement in the investigation, and the adequacy and reliability of the information supplied to the committee. Lewis, 838 S.W.2d at 224. Moreover, in assessing whether the committee has reached a decision that is in the corporation's best interests, courts consider the likelihood that the plaintiff will succeed on the merits, the financial burden on the corporation of litigating the case, the extent to which dismissal will permit the defendant to retain improper benefits, and the effect continuing the litigation will have on the corporation's reputation. Id.

---

[10](...continued)
After a great deal of work on this matter, some definite conclusions can be drawn:

. . . .

3. That little or no effort was made [by Edmondson] to conceal the misappropriations, and the sums misappropriated would have been apparent to anyone reviewing the books, accounts, and records . . . .

. . . .

6. That little or no effort was made by any shareholder to monitor or even inquire as to the affairs of Ram-Tenn, Inc. . . . . .

. . . .

10. That [the plaintiff] (or any other shareholder) in the exercise of any due diligence, [sic] could have ascertained the nature and extent of Edmondson's misappropriations at any time.

Given McLaren's findings and the language found within section 48-18-601 requiring fraudulent concealment on the part of the defendant in order to extend the statute of limitations beyond one year, see Tenn. Code Ann. § 48-18-601, McLaren's decision to extend the scope of review of his report to as many as four years prior to the filing of the lawsuit appears to be generous to the plaintiff.

Mindful of these principles, we note that the record before us establishes that McLaren, an experienced commercial litigator, began his investigation in December 1999 and rendered his first report in October 2000 and a supplemental report in July 2001. Thus, McLaren's investigation spanned nineteen months. During that time, he employed an accounting firm to assist in the investigation at a cost of at least $50,000 to Ram-Tenn. The accounting firm spent 275 hours on the case. McLaren's law firm spent 313 hours performing the investigation at a cost of $70,000 to Ram-Tenn. Further, McLaren consulted with an expert in the hotel industry, along with the real estate appraiser involved in the sale of Ram-Tenn's hotel in Nashville. Thus, not only did McLaren employ outside experts to assist in the lengthy investigation, he spent many hours–at least 250–on the case himself.

Furthermore, we note that McLaren's reports, along with exhibits to the reports, are detailed and extensive, encompassing hundreds of pages. The accounting firm's report by itself is sixty-three pages in length and details the areas of inquiry. Numerous exhibits to the reports, along with the testimony of McLaren and the accountant who assisted him, more than adequately reflect their extensive efforts at uncovering Edmondson's activities. McLaren testified that none of Ram-Tenn's officers or directors attempted to prevent him from receiving any information and that nothing was concealed from him. McLaren described Edmondson as "open and willing to provide" whatever he requested. Indeed, it is uncontraverted that McLaren examined all of Ram-Tenn's records that could be located.

The record also reflects that McLaren deposed witnesses and reviewed thousands of documents supplied by the plaintiff and others. He also met several times with individuals who could provide useful information including, among others, the custodian of Ram-Tenn's records, corporate counsel, the plaintiff, Edmondson, and their lawyers. Further, McLaren reviewed the law concerning stock transfers, statutes of limitations, damages, and the role of special litigation committees. The record also demonstrates that in arriving at his recommendation that the case be settled, McLaren took into account a number of relevant factors–"the likelihood of success on the merits, the extraordinary expense of going forward with the case,[11] the delay in wrapping up the affairs of the nonfunctioning corporation, the age of [Edmondson who was in his eighties and in poor health], the length of time involved to try the case, and the almost certain appellate process following any trial." In the event Edmondson refused to settle in accordance with terms specified in his reports, McLaren recommended that Ram-Tenn pursue the case against him.

Based upon the extensive record before us, we find unconvincing the plaintiff's argument that McLaren's conclusions and recommendations were the product of an inadequate investigation. Indeed, it is difficult to pinpoint what more McLaren could have done in the nineteen months that he conducted the investigation on behalf of Ram-Tenn. Moreover, we have no basis to find that McLaren failed to exercise sound business judgment in determining that the best interests of Ram-Tenn–a nonfunctioning, closely held company–would be served if the case were settled, especially

---

[11]McLaren estimated that to continue the litigation would cost "far in excess" of $250,000 in attorneys's fees alone.

given that the company's primary asset had been sold, the litigation has spanned nearly nine years, and the company is in wind-up mode pending the conclusion of this suit.[12] In short, the record more than adequately demonstrates that McLaren's conclusions and recommendations were the product of much time, effort, and expense. In light of these circumstances, we will not, as we have said, substitute our business judgment for that of the duly appointed independent litigation committee.[13]

## Conclusion

For the foregoing reasons, we hold that Tennessee law does not authorize an award of attorney's fees to a plaintiff in a shareholder's derivative suit brought on behalf of a for-profit corporation. We further hold that the trial court did not err in approving the report of the litigation committee. Accordingly, the judgment of the Court of Appeals is affirmed. The costs in this Court are taxed to the plaintiff, J. O. House, and his surety, for which execution may issue if necessary.

_____
CORNELIA A. CLARK, JUSTICE

---

[12]It is interesting to note that McLaren made a judgment call at the outset of his investigation that because Ram-Tenn's records were not kept in a "sophisticated fashion," expenditures that could not be supported with documentation would be held against Edmondson and placed "in the repayment column." In other words, any lack of information was automatically charged against Edmondson. Contrary to the plaintiff's argument that McLaren's conclusions and recommendations were not in Ram-Tenn's best interests, it seems plausible to us that this approach by McLaren suggests the possibility that McLaren's findings may actually be generous in favor of the corporation.

[13]The plaintiff makes additional arguments concerning the scope of McLaren's authority and the method by which proposed settlement proceeds were to be paid by Edmondson. We have concluded that these alternative arguments have no merit.