IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
May 22, 2012 Session

**AMBER D. BREWSTER v. NICHOLAS GALLOWAY**

**Appeal from the Chancery Court for Anderson County**
**No. 09CH1098    Hon. William E. Lantrip, Chancellor**

—————————

**No. E2011-01455-COA-R3-CV-FILED-JULY 11, 2012**

—————————

This appeal arises out of a custody dispute over Amber D. Brewster and Nicholas Galloway's minor child. When presented with a petition to establish paternity and set child support, Nicholas Galloway acknowledged paternity but filed a petition to be named the primary residential parent. The trial court denied Nicholas Galloway's petition, designated Amber D. Brewster as the primary residential parent, and granted Nicholas Galloway co-parenting time. We affirm the decision of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed; Case Remanded**

JOHN W. MCCLARTY, J., delivered the opinion of the court, in which HERSCHEL P. FRANKS, P.J., joined and CHARLES D. SUSANO, JR., J., concurred filing a separate concurring opinion.

Ricky A.W. Curtis, Blountville, Tennessee, for the appellant, Nicholas Galloway.

Judith R. Whitfield, Oak Ridge, Tennessee, for the appellee, Amber D. Brewster.

**OPINION**

**I. BACKGROUND**

The Child at issue was born to Amber D. Brewster ("Mother") on December 27, 2005. Mother was not married to the Child's father, Nicholas Galloway ("Father"), when the Child was conceived but was in a relationship with Christopher Hill ("Stepfather"), whom she later married. The record reflects that Mother and Father met "online" and had one sexual encounter when Mother was 17 years old and Father was 25 years old. Mother's marriage

to Stepfather produced a second child ("Son"). Likewise, Father married Kellie Edington ("Stepmother"), who had one child ("Stepson") from a previous marriage. Father and Stepmother did not have any other children.

In 2006, Father submitted to a paternity test and was told shortly thereafter that he was the father of the Child. Father met the Child for a brief visit in 2006. Almost four years later, the State filed a petition to establish Father's paternity and to set child support pursuant to Tennessee Code Annotated section 71-3-124. Mother and Father negotiated a visitation arrangement that began shortly thereafter. After seven months of visitation, Father admitted paternity of the Child but requested to be designated as the primary residential parent of the Child. Father alleged that Mother "had a tempestuous, on-and-off again relationship" with Stepfather that was "fraught with mutual, domestic violence, infidelity, and substance abuse" and that she and Stepfather were "heavy consumers of alcohol." Father asserted that Mother failed to address the Child's "medical and developmental issues." Father explained that he had not sought visitation or custody because he consented to Stepfather's adoption of the Child after being led to believe that Stepfather was an appropriate caregiver.

A trial on the petition was held over the course of several months with testimony presented in August 2010 and April 2011. Father, who was 30 years old at the time of trial, testified that he was a joint partner in his family wholesale nursery business and that he lived on the 45-acre business property. He met Mother on a social networking site, which required all users to certify that they were 18 years of age or older. He said that he and Mother communicated for awhile before they "hung out" and had sex. He stated that Mother contacted him approximately one year later to inform him about the Child.

Father testified that Mother told him that she was moving to Kentucky with Stepfather and that Stepfather wanted to adopt the Child. Father related that even though he agreed to the adoption, he received an email from Mother in May 2008 in which she wrote,

[F]***ing call me don[']t make me f**k [you] over for the next 16 years[.]

When he called Mother, she asked for money and told him that if he did not send money, she would seek child support. In January 2009, Mother wrote,

[O]kay so i was wondering how the whole paperwork for [the Child] is coming along signing over your rights for her. [I] haven[']t heard anything or seen anything from you in a while. [M]y dad checks his mail daily for any paperwork that may come from you. [I] have moved to [Kentucky] just to let you know [I will] give you my ad[d]ress it will be at the bottom of this message. [I] would like to hear from you soon. [I] don[']t like bothering you

-2-

because [I] know you have your own family and life as do [I] but it[']s been months. [I]f [I] don[']t hear from you soon [I] will take measures into my own hands and frankly [I] have better things to do.

[It is] is a new year [I am] hoping this will be starting off well, such as getting your paperwork done and to me so [I] can sign, only [I] need a lump sum of money before [I] sign the papers.

He offered to pay the cost of the adoption but did not receive any correspondence from Mother until he received the petition for child support.

Father asked Mother if he could visit with the Child in December 2009. Mother complied, and she brought the Child to the Children's Museum. He recalled that while they were at the Museum, the Child picked up a telephone that was part of an exhibit and said, "Shut the f**k up mother-f**ker" and "Shut up, b***h." Father stated that the second visit occurred a few weeks later when he asked Mother if he could take the Child to dinner. Mother complied, and he and Stepmother drove the Child to a restaurant a few miles from Mother's residence. Father recalled that the Child was upset to leave Mother but eventually calmed down. The third visit lasted "roughly about six hours" on December 24, 2009, while the first overnight visit occurred on December 31, 2009. He recalled that when he attempted to return the Child on January 1, 2010, Mother was not at home and did not respond to his attempts to communicate with her. He waited for 30 minutes before leaving, but he eventually returned the Child to Mother, who was with Stepfather.

Father testified that after the fourth visit, he spent approximately every weekend with the Child until May 2010. He recalled that during that span of visitation, the Child was often presented to them without having had a bath. When he picked the Child up on January 15, 2010, the Child smelled of tobacco and feces. He recalled that during that visit, the Child called Stepson an "ugly f***er." When he picked the Child up on February 12, 2010, the Child smelled of feces, had dirty hair and fingernails, and had food on her face. He related that they took the Child to a restaurant bathroom, where Stepmother discovered dried feces in the Child's underwear.[1] When he picked the Child up on March 19, 2010, the Child's hair was matted, she had dirt under her fingernails, and she smelled like she had been wearing the same underwear for days. He stated that they checked her underwear and found that it had several stains of dried feces and "other stuff." When he picked the Child up on April 10, 2010, the Child's hair was dirty and she had food on her face. When he picked the Child up on April 17, 2010, the Child's hair was dirty, her socks and underwear were dirty, and she had food on her face.

---

[1]Stepmother testified that this incident occurred in March 2010.

Father testified that after he filed the petition for custody, Mother bathed the Child before he arrived. However, when he picked the Child up on June 25, 2010, the Child smelled and her shoes were on the wrong feet. He said that he enjoyed an extended visitation with the Child in April 2010, when he took the Child camping, to Gatlinburg, Tennessee, and to church on Easter Sunday after buying her an outfit for church. He claimed that Mother would not allow him to take the Child on his July 2010 family vacation.

Father presented medical records for the Child, reflecting that the Child had been exposed to secondhand cigarette smoke, was examined frequently for abnormal rashes and anomalies with her vagina and buttocks, and had a lazy eye. He claimed that Mother and Stepfather smoked cigarettes around the Child, exposing her to secondhand cigarette smoke. He also claimed that he and Stepmother noticed that the Child often experienced pain and discomfort in her vagina, which was inflamed and had not been properly cleaned.

Father admitted that Mother had periodically asked him for money but that he did not remit support until May 2010. He explained that he did not know whether Mother really needed money prior to the child support action because she had lied about getting a divorce and her debt. He gave Mother $20 for gas on one occasion, but she spent $200 on a cellular telephone a week later. He purchased items for the Child and offered to purchase more items if Mother provided a list of items. He attempted to place the Child on Stepmother's health insurance, but Mother refused to provide the Child's social security number.

Father stated that he was concerned about Mother's living situation because Mother lived with her 19-year-old brother, her father ("Grandfather"), and Grandfather's girlfriend ("Toni"). He said that Mother shared a bedroom with the Child and Son. He testified that he also had concerns about Mother's character and fitness to parent the Child. He stated that Mother had posted questionable comments on her Facebook account and that Mother posted a survey in which she admitted to using cocaine and other illegal substances. He questioned Mother's relationship with Stepfather, stating that Mother left Stepfather in Summer 2009 because of his repeated drug use and that Stepfather was arrested in April 2010 for drug use. He alleged that despite Stepfather's problems with drugs, Mother continued to visit Stepfather and bring the Child with her. He asserted that Mother also lived with Stepfather at some point after the separation. He contended that Mother and Stepfather were involved in an altercation in November 2009 and that in January 2010, Stepfather was in the car with Mother when he returned the Child to Mother. He admitted that he took the Child to jail to visit Stepfather on Father's Day.

Father proposed a parenting plan that provided for weekend visitation with Mother. He explained that allowing him to care for the Child during the week would ensure that she was properly cared for and cleaned. He admitted that Mother worked on the weekend and

suggested that he could also care for the Child when Mother was at work. He stated that he would likely enroll the Child in Grace Covenant Day Care, where Stepson attended and that the Child would likely attend school in the Knox County School System. He said that he was remodeling his home to add a bedroom for the Child but that if he were granted primary custody, he would move into his brother's vacant manufactured home with Stepmother and Stepson to ensure that the Child had her own bedroom.

Mother said that she moved to Kentucky with Stepfather after the Child was born. She recalled that she and Stepfather lived with another couple in Kentucky for several months and that the couple had two dogs, a pit bull and a rottweiler. When asked whether the dogs had ever bitten anyone, she stated that the dogs "nibble[d]" but had never bitten anyone. Two videos of the dogs were eventually admitted into evidence. The first video depicted two large dogs jumping around and playing aggressively with a man on a bed, while the second video depicted the same dogs playing near the Child.

Mother lived with her brother, Grandfather, and Toni and had a full-time job, where she worked approximately 32 hours per week and made $8 per hour. She worked "every other weekend" and throughout the week from 6 a.m. until 2 p.m., while the Child attended preschool from 8 a.m. until 2 p.m. and then went to day care. She admitted that the Child stayed in day care for several hours but explained that she ran errands before she retrieved the Child. She admitted that before Father filed his petition for custody, she simply retrieved the Child from day care before Father arrived on Friday. She claimed that she left Stepfather in June 2009 but admitted that she was not legally separated and had not filed for divorce. She admitted that she allowed Stepfather to visit Son while the Child was present but asserted that the Child was never left alone with Stepfather. She admitted that Stepfather expressed interest in adopting the Child but explained that he often changed his mind.

Mother testified that she did not allow anyone to smoke around the Child and that the Child was "generally healthy." She recalled that when Father told her about the Child's dirty underwear, she told the day care to ensure that the Child was not defecating in her underwear. She insisted that the Child was capable of using the restroom and cleaning herself. She explained that the Child often had urinary tract infections and that she used prescription and non-prescription creams to remedy the infection and alleviate the pain. She related that the Child took a bath every other day but that if the Child happened to be dirty, she gave the Child a bath every day. She insisted that she never failed to give the Child a bath when the Child needed a bath. She admitted that she refused to provide Father with the necessary information for him to add the Child to Stepmother's insurance. She explained that she thought that Father should be responsible for supplying insurance.

Mother admitted that she had used cocaine and other illegal drugs in high school but claimed that she had not used illegal drugs since then. She claimed that Father knew she was not 18 years old when they met because he bought her a pack of cigarettes and beer. She insisted that she asked Father to visit the Child but that he was always too busy. She admitted that Father sent her money on at least two occasions in 2008 but said that he told her he would not continue to send her money. Despite these complaints, she believed that Father was a good parent. She proposed that Father should visit the Child every other weekend and on the weekends that she had to work. She suggested that she could split the Child's vacation time, allowing him to exercise two weeks of visitation during the summer.

Following the presentation of the above evidence, the case was continued for a number of months. When the case resumed in 2011, Mother admitted that she had recently given birth to a third child ("Daughter") and that Stepfather was not Daughter's father. She moved out of Grandfather's house in November 2010 to an apartment in Clinton, Tennessee. She said that before she began her maternity leave, she took the children to Grandfather's house in the morning and that Toni took Son and the Child to preschool. She testified that Stepfather often watched Son on the weekends. She insisted that she discontinued this practice in February 2011 because she found out that Stepfather "was using again." She admitted that she referred to her children's fathers in derogatory terms, namely "a**hole number one," "a**hole number two," and "a**hole number three." She insisted that she had never used those names in reference to the men in front of the children.

Mother admitted that she unilaterally suspended Father's visitation in October 2010 when she learned that Father had taken the Child to a doctor without her knowledge and had continued to document the Child's yeast infections by photographing her vagina. She stated that she told Father to refrain from inappropriately photographing the Child and to inform her of all future medical appointments. She admitted that when Father returned the Child on October 8, 2010, she was angry with Father and screamed at him, threatened him, and told him that he would never see the Child again. She acknowledged that she overreacted to the situation and that she should have dealt with the situation differently. She admitted that the Child had been sick on several occasions in the past few months. She related that the Child had suffered from a cold, bronchitis, urinary tract infections, and yeast infections. She admitted that the Child had a yeast infection when Father picked the Child up on March 11, 2011, but that the infection had been remedied when Father returned the Child on March 22, 2011. She also admitted that the Child had a similar infection on April 1, 2011. Mother admitted that she suffered from a Methicillin-resistant Staphylococcus aureus ("MRSA") infection but asserted that her condition was not harmful to the Child as long as she cleaned and covered the infection sites.

Stepfather testified that he and Mother separated in June 2009. He admitted that he abused prescription drugs and marijuana in October 2009, that he started selling medication in December 2009, and that he was arrested in April 2010. He recalled that while he was in jail, Father brought the Child to visit him on Father's Day. He related that after he was released from jail, he visited the Child and Son. He stated that in December 2010, he spent the night at Mother's apartment on occasion but that in February 2011, Mother would not allow him to visit because she learned that he had been using drugs. He stated that he always wanted to adopt the Child and that he would still adopt the Child if given the chance. He said that he was scheduled to begin an alcohol and drug rehabilitation program in a few days.

Twanna Rich, Stepfather's mother, testified that Stepfather lived with her for awhile after he was released from jail but that she made him leave when she discovered that he was abusing drugs again. She recalled that while Stepfather was living with her, he, Son, and the Child spent the night on two occasions. Relative to Mother, she stated that Mother, Son, and the Child lived with her for approximately six weeks in 2008. She related that Mother did not cook and clean like she would have liked and that she remembered one occasion where Mother did not change Son's sheets after he had urinated in his bed. She recalled that the Child always had a diaper rash. She believed that Mother was lazy, dirty, and failed to properly clean the children. She admitted that she had referred to Mother in derogatory terms and that she did not have a high opinion of Mother.

Stepmother testified that she was a licensed teacher for the Knox County School System and that she was also a technology coordinator for the special needs department. She recalled that when they first started visiting the Child, she noticed that the Child had not bathed and often complained about her "female areas," which were often inflamed. She related that the Child's underwear was often "very, very dirty" and that the Child's "female areas" would "smell horrendous." She documented the condition the Child arrived in because Mother refused to remedy the situation. She took photographs of the Child before she bathed the Child and treated the inflamed areas. She recalled that the first time she sent the Child home with medication for the inflamation, the Child was returned in the same state. She said that the medication had not been used and that the infection had spread throughout the anal region. She related that she also took the Child to the doctor's office when the Child had a pinworm infection that had spread to her vagina. She testified that Mother became a little more cooperative with the Child's medical care after the court hearing but that Mother still dismissed their concerns.

Stepmother believed that she and Father would take better care of the Child's medical needs and that the Child would be healthier with her and Father. She acknowledged that she was not the Child's mother but said that she would be there for her and take care of her. She

explained that she and Father waited to form a relationship with the Child because they wanted to give Mother the benefit of the doubt and see if the adoption would proceed.

Mariea May testified that she had been the Child's preschool teacher since July 2010. She described the Child as "very happy," "very friendly," and "very articulate for her age." She admitted that she initially had concerns about the Child's fine motor development but opined that the Child had shown "great improvement" in the latest assessment. She stated that Mother had completed all of the requirements for the Child's program and that she had visited Grandfather's home on two occasions. She said that Father and Stepmother had been attending the after-school functions and the parent-teacher conferences. She recalled that she spoke with Father approximately once or twice a week. She testified that Mother did not tell her that she had moved. She stated that the Child used to come to school smelling of cigarette smoke but that she no longer noticed the smell of smoke on the Child. She related that she did not have any school-related concerns for the Child.

Father testified again regarding the Child's latest medical issues. He related that the Child had suffered from multiple yeast infections and had suffered from a "constant runny nose slash cough" since November 2010. He recalled that Mother told him not to worry about the cold symptoms but that when he took the Child to the hospital, the doctor told him that he should have brought the Child to the hospital sooner. He said that he had informed Mother of every recent trip to the hospital and had given her the opportunity to accompany him. He related that he had some problems communicating and coordinating with Mother regarding the Child's medication and medical issues. He stated that he informed Mother of a sore near the Child's buttocks but that Mother did not relay those concerns to the doctor during the Child's appointment. He opined that he was worried about Mother's ability to parent the Child with the added responsibility of caring for Daughter.

Following the hearing, the court designated Mother as the primary residential parent and awarded Father with 80 days of co-parenting time. The court explained that Mother had essentially raised the Child without Father, who had actively pursued the surrender of his parental rights. The court specifically found the testimony of Ms. May to be credible and stated that "there exists no evidence from [Ms. May] that the [C]hild ha[d] been neglected in any way." The court found that the record was "devoid of any medical proof" that the Child's repetitive yeast infections provided any reason to believe that the Child was not properly cared for. Regarding the allegation that Mother had allowed the Child to play with vicious dogs, the court found "that the proof is just absolutely contrary to these dogs showing any vicious tendencies." In designating Mother as the primary residential parent and considering the applicable factors, the court stated,

[The] first [factor,] being the love and affection and ties, I find that factor to weigh slightly in favor of [Mother] primarily because she has been the primary responsible parent for the five and a half years of [the Child's] life. In fact, [Father] was a stranger to her until October of 2009.

I find that the evidence of ability to care has been demonstrated by both parties. Continuity clearly favors [Mother]. I find stability to favor [Father]. Mental and emotional health is equal. Home, school, and community favors [Mother] because the [C]hild is doing well in school and there is no evidence of any negative factors or facts relating to [M]other's care.

Preference is not applicable. Evidence of physical or emotional abuse, I find none to be present unless one could consider the photos. And to be quite honest with you, I find the continued and multiple photographs to be offensive. And I would suspect that a mental health witness, if called upon, would have negative comments with respect to the repetitive photographs of the vaginal area of [the Child].

Factor number nine; the character of other parties in the home. [Stepfather] is the one that appears to be objected to by [Father]. This man essentially raised [the Child] as the father. He has not been in the home except on an infrequent basis. He has been eliminated from being present after it was discovered that he was no longer clean and was once again using drugs.

I find the parents' willingness to encourage relationships to be equally balanced with - - noting that [Mother] voluntarily gave liberal visitation to [Father] without the presence of a court order.

The court ultimately found that "[i]n weighing the factors that the statute provides, . . . the best interest of [the Child] is that [Mother] be designated as the primary residential parent." The court also awarded Mother attorney fees. This timely appeal followed.

## II. ISSUES

We consolidate and restate the issues raised on appeal by Father as follows:

A. Whether the trial court erred in designating Mother as the primary residential parent of the Child.

B. Whether the trial court erred in granting Mother's request for attorney fees.

-9-

## III. STANDARD OF REVIEW

On appeal, the factual findings of the trial court are accorded a presumption of correctness and will not be overturned unless the evidence preponderates against them. *See* Tenn. R. App. P. 13(d). The trial court's conclusions of law are subject to a de novo review with no presumption of correctness. *Blackburn v. Blackburn*, 270 S.W.3d 42, 47 (Tenn. 2008); *Union Carbide Corp. v. Huddleston*, 854 S.W.2d 87, 91 (Tenn. 1993). Mixed questions of law and fact are reviewed de novo with no presumption of correctness; however, appellate courts have "great latitude to determine whether findings as to mixed questions of fact and law made by the trial court are sustained by probative evidence on appeal." *Aaron v. Aaron*, 909 S.W.2d 408, 410 (Tenn. 1995).

Trial courts have broad discretion to fashion parenting plans that best suit the unique circumstances of each case. *See Parker v. Parker*, 986 S.W.2d 557, 563 (Tenn. 1999). "Because '[c]ustody and visitation determinations often hinge on subtle factors, including the parents' demeanor and credibility during the divorce proceedings themselves,' appellate courts 'are reluctant to second-guess a trial court's decisions.'" *Johnson v. Johnson*, 165 S.W.3d 640, 645 (Tenn. Ct. App. 2004) (quoting *Gaskill v. Gaskill*, 936 S.W.2d 626, 631 (Tenn. Ct. App. 1996)). Thus, appellate courts should only set aside the trial court's judgment in such cases when it "falls outside the spectrum of rulings that might reasonably result from an application of the correct legal standards to the evidence found in the record." *Eldridge v. Eldridge*, 42 S.W.3d 82, 88 (Tenn. 2001).

## IV. DISCUSSION

### A.

Father asserts that the trial court's designation of Mother as the primary residential parent was contrary to the preponderance of the evidence presented at trial. Mother responds that the evidence does not preponderate against the best interest finding of the trial court.

In determining matters regarding the custody and care of a child, the trial court must make its decision in accordance with the best interest of the child. Tenn. Code Ann. § 36-6-106(a). In making its decision, the court must consider the following factors:

> (1) The love, affection and emotional ties existing between the parents or caregivers and the child;

(2) The disposition of the parents or caregivers to provide the child with food, clothing, medical care, education and other necessary care and the degree to which a parent or caregiver has been the primary caregiver;

(3) The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment; provided, that, where there is a finding, under subdivision (a)(8), of child abuse, as defined in [section] 39-15-401 or [section] 39-15-402, or child sexual abuse, as defined in [section] 37-1-602, by one (1) parent, and that a nonperpetrating parent or caregiver has relocated in order to flee the perpetrating parent, that the relocation shall not weigh against an award of custody;

(4) The stability of the family unit of the parents or caregivers;

(5) The mental and physical health of the parents or caregivers;

(6) The home, school and community record of the child;

(7)(A) The reasonable preference of the child, if twelve (12) years of age or older;

(B) The court may hear the preference of a younger child on request. The preferences of older children should normally be given greater weight than those of younger children;

(8) Evidence of physical or emotional abuse to the child, to the other parent or to any other person; provided, that, where there are allegations that one (1) parent has committed child abuse, as defined in [section] 39-15-401 or [section] 39-15-402, or child sexual abuse, as defined in [section] 37-1-602, against a family member, the court shall consider all evidence relevant to the physical and emotional safety of the child, and determine, by a clear preponderance of the evidence, whether such abuse has occurred. The court shall include in its decision a written finding of all evidence, and all findings of facts connected to the evidence. In addition, the court shall, where appropriate, refer any issues of abuse to the juvenile court for further proceedings;

(9) The character and behavior of any other person who resides in or frequents the home of a parent or caregiver and the person's interactions with the child; and

(10) Each parent's or caregiver's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, consistent with the best interest of the child.

Tenn. Code Ann. § 36-6-106(a)(1)-(10).

In this case, the testimony presented at trial reflected that the Child exhibited a strong bond with Mother as evidenced by the Child's initial distress when Father exercised his first unsupervised visit with the Child. We acknowledge that Father also enjoyed a healthy relationship with the Child once he began to visit the Child. However, the first and third factors weigh in Mother's favor given that she had been the primary caregiver for the Child for the majority of the Child's life, that she provided a home for the Child for several years without the assistance of Father, and that no evidence was presented that Mother's living situation was harmful to the Child. Tenn. Code Ann. § 36-6-106(a)(1), (3).[2] The second factor also favors Mother. Tenn. Code Ann. § 36-6-106(a)(2). We acknowledge the concern for the Child's hygiene while in Mother's care. The Child's hygiene improved when the concerns were relayed to Mother, and Mother made various medical appointments for the Child. Therefore, Mother exhibited a disposition of providing for the Child with the necessary assistance in these matters. Likewise, Father made necessary medical appointments for the Child and provided clothing once he became involved in the Child's life. However, this factor weighs in favor of Mother given her history as the Child's primary caregiver. Likewise, Mother fostered the Child's home, school and community record, which appear to be stable, without Father's assistance for several years. Tenn. Code Ann. § 36-6-106(a)(6). Therefore, the sixth factor also weighs in Mother's favor.

Father is undoubtedly more stable than Mother because of his healthy relationship with Stepmother and because of his involvement in a successful family business, providing him with a stable income and residence. Tenn. Code Ann. § 36-6-106(a)(4). No evidence was presented regarding the mental health of the parents. While questions were raised regarding Mother's MRSA infection, no testimony was presented that her condition would affect her ability to parent the Child. Tenn. Code Ann. § 36-6-106(a)(5). Accordingly, factor five does not favor either parent. The Child's preference was not given or considered by the trial court, and no testimony was presented that the Child had suffered from physical or emotional abuse. Tenn. Code Ann. § 36-6-106(a)(7), (8). Stepfather's character is

---

[2]We, like the trial court, dismiss Father's allegations regarding Mother's failure to protect the Child from vicious dogs. The evidence reflected that the dogs were simply playing with their owner and were subsequently allowed to play nearby the Child, who was being supervised by several adults.

questionable given his admitted repeated problems with a continuing drug addiction; however, Mother refused to allow Stepfather near the Child when he was exhibiting signs of addiction. Accordingly, factor nine does not favor either parent. Tenn. Code Ann. § 36-6-106(a)(9). We, like the trial court, believe that the tenth factor is equally divided between the parents. Tenn. Code Ann. § 36-6-106(a)(10). Neither parent exhibited a stellar performance of *past* parenting responsibilities, as evidenced by Father's absence for several years and the concerns regarding the Child's hygiene while in Mother's care. We believe that the parents' potential for future performance of these responsibilities is equal, as evidenced by Father's involvement in the Child's life and the Child's improvement after the hygiene concerns were relayed to Mother. Additionally, their willingness to encourage a close relationship is also equal. Despite some arguments, Mother allowed visitation with Father prior to a court order, and Father was largely respectful of the reasonable visitation limitations. We believe that with a court-approved parenting plan, the parents should amicably facilitate visitation between the two homes.

With all of the above considerations in mind, we conclude that the naming of Mother as the primary residential parent was in the best interest of the Child. In so holding, we note that factors one, two, three, and six favored Mother, while factor four favored Father and factors five, seven, eight, nine, and ten were either equally divided or favored neither parent. Accordingly, we affirm the decision of the trial court but further advise the parents that failure to promote and encourage a close relationship between the Child and the other parent may result in the custody determination being reviewed in the future.

B.

Father asserts that the trial court never identified any legal basis for its award of attorney fees. Father contends that there was not a legal basis for the attorney fee award and that the award was contrary to the plain language of Tennessee Code Annotated section 36-5-103, which provides for an award of attorney fees to a *spouse* in custody cases. Father argues that the award was inappropriate because he and Mother were never married, meaning she was also never his spouse. Mother responds that the statute providing for an award of attorney fees in similar matters is not limited to custody disputes involving spouses.

In this case, the court found that a legal basis existed for an award of attorney fees and that it was "an appropriate case for an award of costs and attorney fees, considering the complexity of the case and the amount of effort put forth in the case by both attorneys." The court awarded Mother with a judgment against Father in the amount of $18,845.10, representing attorney fees of $18,220 and costs of $625.10.

Tennessee follows the American Rule which provides that "litigants pay their own attorney's fees absent a statute or an agreement providing otherwise." *State v. Brown & Williamson Tobacco Corp.*, 18 S.W.3d 186, 194 (Tenn. 2000); *accord Taylor v. Fezell*, 158 S.W.3d 352, 359 (Tenn. 2005). "Under the American [R]ule, a party in a civil action may recover attorney fees only if: (1) a contractual or statutory provision creates a right to recover attorney fees; or (2) some other recognized exception to the American [R]ule applies, allowing for recovery of such fees in a particular case." *Cracker Barrel Old Country Store, Inc. v. Epperson*, 284 S.W.3d 303, 308 (Tenn. 2009) (citing *Taylor*, 158 S.W.3d at 359; *John Kohl & Co. v. Dearborn & Ewing*, 977 S.W.2d 528, 534 (Tenn. 1998)). "[A]s a general principle, the American [R]ule reflects the idea that public policy is best served by litigants bearing their own legal fees regardless of the outcome of the case." *House v. Estate of Edmondson*, 245 S.W.3d 372, 377 (Tenn. 2008).

A right to recover attorney fees in custody disputes was created in Tennessee Code Annotated 36-5-103(c),which provides,

> The plaintiff spouse may recover from the defendant spouse, and the spouse or other person to whom the custody of the child, or children, is awarded may recover from the other spouse reasonable attorney fees incurred in enforcing any decree for alimony and/or child support, or in regard to any suit or action concerning the adjudication of the custody or the change of custody of any child, or children, of the parties, both upon the original divorce hearing and at any subsequent hearing, which fees may be fixed and allowed by the court, before whom such action or proceeding is pending, in the discretion of such court.

Father does not dispute the amount of the attorney fee award but asserts that the "[g]uidelines of statutory construction easily dismiss any contention that Mother can rely upon this statute to justify her award." Father notes that the language of the statute is clear that "in order to rely upon it to seek attorney's fees from the other spouse, the parties must be, or have been, "spouses."' The record before this court does not reflect that Father ever raised an issue regarding Mother's ability to recover attorney fees because she was never his spouse. A party may not offer a new issue for the first time on appeal. *See Lane v. Becker*, 334 S.W.3d 756, 764 (Tenn. Ct. App. 2010) (citing *Campbell Cnty. Bd. of Educ. v. Brownlee-Kesterson, Inc.*, 677 S.W.2d 457, 467 (Tenn. Ct. App. 1984)). If Father had raised the issue, the trial court could have addressed Father's concerns and provided a record for this court's review.

Additionally, this court has upheld an award of attorney fees in similar cases pursuant to Tennessee Code Annotated section 36-5-103(c). *See Miller v. Welch*, 340 S.W.3d 708, 714-15 (Tenn. Ct. App. 2010) (upholding an award of attorney fees to mother of child born

out of wedlock when father appealed the court's setting of child support and attorney fee award); *Massey v. Casals*, 315 S.W.3d 788, 799 (Tenn. Ct. App. 2009) (upholding an award of attorney fees to mother of child born out of wedlock in child support modification case). Accordingly, we conclude that a legal basis existed to support the attorney fee award and that the court did not abuse its discretion in awarding attorney fees to Mother.

## V. CONCLUSION

The judgment of the trial court is affirmed, and the case is remanded for such further proceedings as may be necessary. Costs of the appeal are taxed to the appellant, Nicholas Galloway.

_____
JOHN W. McCLARTY, JUDGE