IN THE SUPREME COURT OF TENNESSEE
AT KNOXVILLE
January 8, 2025 Session

## BRETT W. HOUGHTON ET AL. v. MALIBU BOATS, LLC

**Appeal by Permission from the Court of Appeals
Circuit Court for Loudon County
No. 2018-CV-12     Michael S. Pemberton, Judge**

_____

**No. E2023-00324-SC-R11-CV**
_____

In this appeal, we address whether a defendant may obtain the dismissal of a lawsuit based on a challenge to the plaintiff's standing asserted for the first time after the jury returned its verdict. Husband and wife Brett and Ceree Houghton were the sole shareholders of a corporation that operated a boat dealership. The company was an authorized dealer of manufacturer Malibu Boats, LLC. After that business relationship fell apart, the dealership went out of business, and the Houghtons each declared bankruptcy. Thereafter, the Houghtons successfully sued the manufacturer for intentional misrepresentation, fraudulent concealment, and promissory fraud. A jury awarded $900,000 in compensatory damages for the loss of equity in real property owned by the dealership that was sold at foreclosure when the dealership failed. The manufacturer filed a motion for judgment notwithstanding the verdict or new trial in which it raised various issues. At the hearing on the motion, however, the manufacturer orally raised a new issue: It questioned the Houghtons' standing, given that the damages related to real property owned by the dealership instead of them. After the parties submitted briefing, the trial court determined that the Houghtons could not pursue the asserted claims in their own names. Instead, the claims belonged to the dealership and were available to the Houghtons only through a shareholder derivative proceeding. The Houghtons admittedly had not complied with the statutory mechanism for such a proceeding. Thus, the trial court concluded that the Houghtons lacked so-called "statutory standing." Finding that the lack of statutory standing deprived it of subject matter jurisdiction, the trial court dismissed the suit. On appeal as of right, the Court of Appeals reversed. The intermediate appellate court determined that so-called "shareholder standing" principles govern this case. Importantly, the court concluded that shareholder standing limitations are not jurisdictional and, therefore, are subject to waiver. The court further concluded that the manufacturer waived its challenge by not timely asserting the issue. We granted permission to appeal. Based on our review of the record and the applicable law, we hold that the Houghtons had constitutional standing to bring their suit. We further hold that the trial court erred in relying on statutory standing principles to dismiss the suit. Instead, the substance of the standing challenge implicated shareholder standing limitations, and the manufacturer

forfeited its challenge. Accordingly, we affirm the judgment of the Court of Appeals and remand this case to the trial court for further proceedings consistent with this opinion.

**Tenn. R. App. P. 11 Appeal by Permission;
Judgment of the Court of Appeals Affirmed;
Case Remanded to the Trial Court**

JEFFREY S. BIVINS, C.J., delivered the opinion of the Court, in which HOLLY KIRBY, SARAH K. CAMPBELL and MARY L. WAGNER, JJ., joined. DWIGHT A. TARWATER, J., not participating.

Taylor A. Williams, Kyle A. Baisley and W. Michael Baisley, Knoxville, Tennessee, for the appellant, Malibu Boats, LLC.

Dale J. Montpelier and Katherine A. Young, Knoxville, Tennessee, for the appellees, Brett W. Houghton and Ceree A. Houghton.

## OPINION

### I. FACTUAL AND PROCEDURAL BACKGROUND

This case arose from a failed business relationship between a boat manufacturer and one of its authorized dealers. Malibu Boats, LLC ("Malibu Boats" or "the Defendant") is a Delaware limited liability company with an international presence. It designs and manufactures what are classified as performance sports boats, and its largest manufacturing facility is in Loudon County, Tennessee. Its boats are sold through more than one hundred independent dealers, each with an exclusive dealer area. At the time of the events giving rise to this case, the Defendant enjoyed a significant market share in its product category.

Brett Houghton was a Malibu Boats aficionado as far back as the early 1990s. In 2009, he and his wife, Ceree Houghton, (collectively, "the Plaintiffs") formed a Tennessee corporation known as Great Wakes Boating, Inc. ("Great Wakes"). They each owned fifty percent of the company. The corporation operated a boat dealership on real property owned by Great Wakes in Lenoir City, Tennessee, not far from the Defendant's Loudon County manufacturing facility. The dealership had a showroom for the display and sale of boats and related products, and it had an extensive facility for servicing boats. Thus, Great Wakes had two revenue streams, one related to sales and another related to servicing boats. At its height, Great Wakes employed twelve people, but the decision-makers were the Plaintiffs. Great Wakes was an authorized Malibu Boats dealer from its inception, and Mr. Houghton was proud of this fact given how much he believed in the products.

The business relationship between Great Wakes and the Defendant was memorialized through yearly "dealer agreements." A new model year of boats began each July, and the dealer agreements were structured accordingly. Thus, the dealer agreements

ran from July 1 of one year through June 30 of the following year, and they were identified by the upcoming year. In other words, an agreement running from July 1, 2014, through June 30, 2015, was designated as a 2015 dealer agreement. As part of a dealer agreement, Great Wakes would commit to purchase a minimum number of boats from the Defendant, which Great Wakes then would sell to consumers.

Great Wakes purchased boats from the Defendant through a financing arrangement known in the industry as "floor plan financing." Great Wakes had a contractual arrangement with a financial institution whereby the institution paid the Defendant when Great Wakes purchased a boat. Great Wakes then would pay the institution when Great Wakes sold the boat to a consumer. In essence, the floor plan financing arrangement operated like a line of credit between Great Wakes and the financial institution. However, to protect the financial institution and to provide an incentive to move inventory, the dealership would be required to pay interest, and eventually even principal, if the boat had not been sold within a certain period of time.

The relationship between Great Wakes and the Defendant apparently flourished during the first few years. In fact, Great Wakes won several awards, and the Defendant even toured prospective dealers from around the world through the Great Wakes facility. Furthermore, in 2012, Great Wakes expanded its original facility by purchasing adjacent property. Later, in June 2014, Great Wakes refinanced its combined properties ("the Real Properties") to take advantage of equity and significantly increased its available floor plan financing, from $1.25 million to $2.0 million. The Plaintiffs were personal guarantors on the re-financed mortgage and on the floor plan financing arrangement. According to the Plaintiffs, the Defendant was aware of the personal guarantees.

Unbeknownst to the Plaintiffs, however, even as Great Wakes was expanding, the Defendant was growing dissatisfied with the relationship and was considering replacing Great Wakes. Ultimately, in February 2015, the Defendant terminated the relationship with Great Wakes and gave its dealer territory to a new authorized dealership, Sunny Marine. Great Wakes had several pre-sold boats on order with the Defendant but never received them (or the proceeds that would have been due from completing the sales). In addition, the Defendant cut off access to its "dealer portal," meaning that Great Wakes was unable to order parts to service boats.

Great Wakes attempted to continue operations by acquiring boat lines from manufacturers other than the Defendant, but the effort was short-lived. The timing was such that Great Wakes was unable to recover from losing Malibu Boats. As a result, Great Wakes went out of business. Various creditors obtained judgments against both Great Wakes and the Plaintiffs as personal guarantors on certain debts of the corporation, and the Real Properties were sold at foreclosure. In 2016, the Plaintiffs were forced to declare bankruptcy.

In February 2018, the Plaintiffs sued the Defendant.[1] Their suit was not based on any alleged breach of the dealer agreements between Great Wakes and the Defendant. Instead, their asserted causes of action were three intentional torts: intentional misrepresentation, fraudulent concealment, and promissory fraud.[2] The Plaintiffs alleged that they were injured by misrepresentations and omissions on the part of the Defendant. As for damages, the Plaintiffs alleged, in part:

> As a result of the foregoing [misrepresentations and omissions], Great Wakes lost customers, new boat sales, the ability for trade-in transactions, the ability to sell Malibu parts, the ability to provide warranty service, other dealer benefits, the ability to make payroll, the ability to pay bills as they came due, the ability to pay on the floor plans, and the ability to service its debts, all of which directly caused damage to Plaintiffs by virtue of the destruction of their business, the loss of their livelihood, the loss of the value of their stock, and the loss of their personal assets to the extent invested in the business.

The suit underwent a significant pre-trial practice, including multiple motions to dismiss, a stay for an attempt to re-open Mr. Houghton's bankruptcy due to alleged fraud, and a complex motion to exclude the Plaintiffs' expert evidence on the valuation of Great Wakes. Eventually, in September 2022, the case was tried before a jury over the course of five days. The parties offered different explanations for the deterioration of the relationship between Great Wakes and the Defendant.

The Plaintiffs suggested that the Defendant was unhappy with Great Wakes' decision to switch floor plan financing companies in the summer of 2013. The Defendant had a special relationship with Great Wakes' prior floor plan financing company, GE Capital, that was advantageous for the Defendant. Great Wakes switched from GE Capital to Northpoint Commercial Finance ("Northpoint") because Great Wakes believed the deal with Northpoint was better for Great Wakes. Around this time, unbeknownst to the Plaintiffs, the Defendant began exploring potential replacements for Great Wakes.

Nevertheless, Great Wakes continued to be an authorized dealer of Malibu Boats after the switch to Northpoint in summer of 2013. As previously mentioned, Great Wakes even re-financed the Real Properties and increased its amount of floor plan financing through Northpoint during the early summer of 2014. In June 2014, because of its increased floor plan financing, Great Wakes agreed to take a greater than usual number of model-year-2014 boats from the Defendant. Great Wakes made the decision in furtherance of the relationship with the Defendant even though it was to the detriment of Great Wakes

---

[1] The record contains only sparse details, but it appears that Great Wakes sued the Defendant well before the Plaintiffs did. However, Great Wakes non-suited in June 2016.

[2] The Plaintiffs initially also sued for negligent misrepresentation but later dismissed that cause of action.

because the model year was about to change. Typically, an older boat would be more difficult to sell in the new model year, and it likely would have to be sold at a discount, meaning less profit for the dealership. Moreover, the model-year-2014 boats filled up Great Wakes' newly expanded floor plan financing.

When the new model year began in July 2014, Great Wakes expected to enter into 2015 dealer agreements with the Defendant.[3] There was an initial delay in the Defendant's sending the agreements to Great Wakes, but this circumstance was not unusual. Eventually, however, Great Wakes became more insistent on receiving the 2015 dealer agreements because Northpoint wanted the agreements in place. In October 2014, the Defendant's national sales director, Scott Davenport, emailed Mr. Houghton apologizing for the delay. Mr. Davenport indicated that the 2015 dealer agreements would be sent shortly to Mr. Houghton and to Gary Morrison, the Defendant's regional sales manager and employee with whom Mr. Houghton had the most interaction. Shortly thereafter, Mr. Houghton received the 2015 dealer agreements, already signed by Mr. Morrison. Mr. Houghton signed the 2015 dealer agreements on behalf of Great Wakes on October 16, 2014, and returned them to the Defendant.

Unbeknownst to the Plaintiffs, however, because the 2015 dealer agreements were not signed by Mr. Davenport, the Defendant did not consider them to be effective. In fact, the evidence at trial showed that the Defendant never intended to enter into 2015 dealer agreements with Great Wakes. Around this same time in October 2014, and unknown to the Plaintiffs, the Defendant contacted Sunny Marine about replacing Great Wakes.

Coincidentally, only a couple of months after Mr. Houghton signed the 2015 dealer agreements in October 2014, the Plaintiffs entertained the idea of selling Great Wakes to Sunny Marine.[4] In December 2014, Mr. Houghton asked the Defendant's regional sales manager, Gary Morrison, if he knew of anyone who might be interested in buying Great Wakes. One of the names provided was Sunny Marine. In early January 2015, Mr. Houghton executed a confidentiality agreement with the owner of Sunny Marine and sent him financial information about Great Wakes. Ultimately, the Plaintiffs decided they did not want to pursue selling Great Wakes. However, during this time, the Defendant and Sunny Marine kept the Plaintiffs in the dark regarding their discussions about Sunny Marine replacing Great Wakes.

The Plaintiffs testified that had they known the truth—that the Defendant never intended to enter into 2015 dealer agreements with Great Wakes—they would have made different decisions. For example, they would not have re-financed the Real Properties and

---

[3] Great Wakes and the Defendant technically entered into two dealer agreements each year, corresponding to two different boat lines featured by Great Wakes. The substantive terms of the two agreements did not differ in any way relevant to this appeal.

[4] Mr. Houghton suffered a stroke in August 2014 and was unsure whether he would be able to return fully to work.

increased the amount of floor plan financing, nor would they have agreed to accept the large number of model-year-2014 boats at the end of the model year in June 2014. The Plaintiffs testified that were it not for the Defendant's deception and concealment, they most likely would not have gone out of business and, thus, would not have incurred the associated adverse financial consequences. Instead, Great Wakes collapsed, the Plaintiffs lost everything they had put into the business and were forced to declare bankruptcy, and their credit score "went into the toilet."

For its part, the Defendant did not contest many of the pertinent details put forth by Great Wakes. However, the Defendant suggested that from 2012 onward, Great Wakes exhibited financial difficulties, and its business practices were not compliant with its floor plan financing arrangements. In fact, GE Capital warned Great Wakes about potential termination of its floor plan financing agreement in 2013. Furthermore, in September and October of 2014, Northpoint notified Great Wakes that it was in default on its floor plan financing agreement and accelerated the amount due. Given these circumstances, the Defendant explained that it was concerned about the viability of Great Wakes. Thus, it was prudent to explore the possibility of replacing Great Wakes. Moreover, the Defendant maintained that, pursuant to the dealer agreements, it was not obligated to inform Great Wakes when it spoke to other potential dealers. The Defendant offered testimony that it attempted to work with Great Wakes through various financial difficulties but concluded in February 2015 that the best choice was to make a change in dealers.

The jury returned a verdict for the Plaintiffs as to all three of their claims. On the verdict form, the jury indicated that the Plaintiffs had proven that they sustained damage as a result of the Defendant's conduct. The verdict form listed four categories of damages:

(1) Boat show expenses incurred;[5]
(2) Loss of equity in dealership buildings;[6]
(3) Diminution of value of business;[7]
(4) Non-economic damages: Pain and suffering.[8]

---

[5] Knoxville, Tennessee hosted a boat show in March 2015, which included multiple manufacturers and dealers. Great Wakes incurred expenses to attend the show, believing attendance was required by the dealer agreements. However, Mr. Houghton testified that Great Wakes would not have attended the show had he understood the 2015 dealer agreements were not effective.

[6] The Plaintiffs offered testimony that upon re-financing the Real Properties in 2014, their value was $2.6 million. After Great Wakes went out of business, the properties were sold at foreclosure for $1.7 million.

[7] The Plaintiffs offered an expert report as to the value of a 100% equity interest in Great Wakes, and the Defendant offered a competing expert report attacking the reliability of the Plaintiffs' expert proof.

[8] During closing argument, counsel for the Plaintiffs argued that the Plaintiffs felt "anguish, grief, [and] shame" from "pouring their hearts into this business and relying on Malibu and being deceived." Counsel stated, "[T]hat is something that nobody can put a number to, but you [the jury]."

For reasons that are not detailed in the record, the Plaintiffs' expert valuation of the business did not include the Real Properties owned by Great Wakes.[9] As a result, the verdict form listed loss of equity in the dealership buildings separately from the diminution in value of the business. The jury entered zero for each category of damage other than loss of equity in dealership buildings, which the jury set at $900,000.00.

Thereafter, the Defendant filed a motion for judgment notwithstanding the verdict or new trial. The motion focused primarily on two issues. First, the Defendant argued that under the "benefit of the bargain" rule, the Plaintiffs' evidence of damages did not prove the value the Real Properties would have had if the Defendant's alleged misrepresentations about the 2015 dealership agreements instead had been true.[10] Second, the Defendant contended that the damages award improperly failed to consider the debt owed on the Real Properties. In both circumstances, the Defendant maintained that the Plaintiffs' proof was inadequate and left the jury to speculate as to the appropriate damages. Interestingly, the Defendant's motion mistakenly indicated that the Real Properties were owned by the Plaintiffs.

At the hearing on the motion, the Defendant orally raised a new issue purporting to implicate subject matter jurisdiction.[11] The trial court requested briefing on the issue, given that it had not been "raised in the written motions nor briefed." In light of the procedural posture, the trial court asked the parties to address both the substantive issue and whether it was waivable.

In its briefing, the Defendant challenged the Plaintiffs' standing. The Defendant argued that the Plaintiffs were not the proper party to assert any causes of action for damages associated with the Real Properties because they did not own the properties and did not suffer any financial loss as a result of their status as personal guarantors on the mortgage. Instead, the Defendant contended that, because Great Wakes owned the properties, the claims asserted by the Plaintiffs rightfully belonged to Great Wakes. According to the Defendant, the Plaintiffs could bring them only derivatively on behalf of the corporation, and they had not complied with the pertinent statutory requirements. See Tenn. Code Ann. § 48-17-401 (2019) (identifying requirements for a shareholder derivative proceeding). Thus, the Defendant framed the issue as one of "statutory standing," which

---

[9] As a general matter, it seems logical that the value of the business would include assets owned by Great Wakes, such as the Real Properties. However, the Plaintiffs' expert report indicated that "[i]t is a common practice to value the real estate separately from the operating business."

[10] The "benefit of the bargain," a concept relevant to the computation of certain damages, refers to "the difference between the value of what the plaintiff would have received if the misrepresentation had been true and the actual value of what the plaintiff received." T.P.I.—Civil § 8.49. At the Defendant's urging, the jury was instructed accordingly.

[11] Although the record contains subsequent filings and orders related to this issue, it does not contain a transcript of this hearing. We glean the substance of the new issue from the subsequent filings.

the Defendant argued was not waivable because it was interwoven with subject matter jurisdiction. See, e.g., Osborn v. Marr, 127 S.W.3d 737, 740 (Tenn. 2004) ("When a statute creates a cause of action and designates who may bring an action, the issue of standing is interwoven with that of subject matter jurisdiction and becomes a jurisdictional prerequisite.").

In contrast, the Plaintiffs argued that the standing issue identified by the Defendant was not one of statutory standing. The Plaintiffs asserted that the Defendant's attempt to pigeonhole their suit into the statutory framework of a derivative proceeding was misguided. Quite simply, the Plaintiffs did not pursue a derivative proceeding, and thus, the statutory framework and any related standing principles did not apply. Instead, the issue raised by the Defendant implicated what the Plaintiff referred to as "non-constitutional" standing principles. Therefore, the Plaintiffs asserted that the issue was waivable and, in fact, had been waived.

The trial court concluded that the Defendant had the better argument. It found that the Plaintiff's claims and the resulting damages awarded by the jury belonged to Great Wakes. As a result, Great Wakes could pursue the claims in its own name, or shareholders could pursue them through a derivative proceeding. However, the Plaintiffs as shareholders did not have standing to bring the claims in their own names. Thus, the trial court determined that "the doctrine of constitutional or statutory standing applies to this matter." Finding "constitutional or statutory standing" jurisdictional and, therefore, non-waivable, the trial court concluded that the issue was properly before the court. The trial court further concluded that it lacked subject matter jurisdiction because the Plaintiffs lacked standing to pursue the asserted claims. As a result, the trial court dismissed the suit with prejudice and pretermitted the Defendant's other issues. However, the trial court specifically noted that if the standing issue were not jurisdictional, it would conclude that the Defendant waived the issue.

On the Plaintiffs' appeal as of right, the Court of Appeals reversed. Houghton v. Malibu Boats, LLC, No. E2023-00324-COA-R3-CV, 2024 WL 1598815, at *1 (Tenn. Ct. App. Apr. 12, 2024), perm. app. granted, (Tenn. Aug. 20, 2024). The court rejected the Defendant's argument that the trial court lacked subject matter jurisdiction due to the Plaintiffs' failure to comply with the statutory requirements of a shareholder derivative proceeding. Id. at *6. Instead, the court looked to the nature of the action actually pursued by the Plaintiffs. The court noted that it is permissible for shareholders to file suit in their own name under certain circumstances. Id. at *5–6 (citing Keller v. Estate of McRedmond, 495 S.W.3d 852, 868–69 (Tenn. 2016)). In that regard, the court identified the standard for evaluating so-called "shareholder standing" limitations and, more significantly, concluded that the concept does not implicate subject matter jurisdiction. Id. at *6. Having concluded that shareholder standing limitations are not jurisdictional, the court then determined that the Defendant waived the issue by not raising its challenge until the hearing on its post-trial motion for judgment notwithstanding the verdict. Id. at *7. The court

remanded for the trial court to consider the post-trial issues that were pretermitted by the dismissal on standing grounds.  Id.

Malibu Boats sought permission to appeal, framing the question as follows:

> Can a Tennessee court disregard the jurisdictional statutory filing requirements set forth in Tennessee Code Annotated section 48-17-401, resulting in the shareholders of a domestic corporation personally recovering damages for an alleged harm suffered only by the corporation, where the shareholders either failed to comply with the statutory filing requirements, or intentionally decided not to file their claims derivatively in the name of the corporation?

We granted permission to appeal and requested that the parties address the following questions:

> In addition to addressing whether Plaintiffs have statutory standing to bring their claims and whether an objection to statutory standing is subject to waiver or forfeiture, the parties' briefs should also address (1) the applicability, if any, of the third-party standing rule and the shareholder standing rule, (2) whether any defect in Plaintiffs' standing is constitutional or non-constitutional in nature; and (3) whether any objections to standing that are grounded in the third-party standing rule or shareholder standing rule are subject to waiver or forfeiture.

Order, Houghton v. Malibu Boats, LLC, No. E2023-00324-SC-R11-CV (Tenn. Aug. 20, 2024) (granting application for permission to appeal).

## II. ANALYSIS

The gravamen of the Defendant's argument in this Court, as in the courts below, is that the Plaintiffs pursued claims and ultimately were awarded damages that belonged not to them, but to Great Wakes.  The Defendant frames its argument upon the doctrine of standing and contends that the Plaintiffs' suit must be dismissed because the Plaintiffs lack standing.  However, in the trial court, the Defendant only raised the issue orally during a hearing on its motion for judgment notwithstanding the verdict.  Indeed, even the written motion filed by the Defendant did not challenge the Plaintiffs' standing.  Given these circumstances, the Plaintiffs argue that the Defendant forfeited its standing challenge.

Whether a standing issue is subject to forfeiture depends on whether it implicates subject matter jurisdiction.[12]  Thus, in this appeal, we must determine the specific aspects

---

[12] Subject matter jurisdiction refers to a court's constitutional or statutory power to adjudicate a case.  See, e.g., Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 89 (1998); Northland Ins. Co. v. State,

of the standing doctrine at issue in this case, whether they implicate subject matter jurisdiction, and, if not, whether the Defendant forfeited its challenge.[13]

## A. Standard of Review

The Defendant's challenge in this case arose in the context of a motion for judgment notwithstanding the verdict. However, the challenge focuses on the Plaintiffs' standing, and the Defendant argues that the standing principles applicable in this case implicate subject matter jurisdiction. The issue of whether a party has standing is a question of law. In re Estate of Smallman, 398 S.W.3d 134, 148 (Tenn. 2013). Likewise, the determination of whether subject matter jurisdiction exists is a question of law. Northland Ins. Co. v. State, 33 S.W.3d 727, 729 (Tenn. 2000). This Court reviews the determination of questions of law de novo and affords no presumption of correctness to lower court rulings. Estate of Smallman, 398 S.W.3d at 148; Northland Ins., 33 S.W.3d at 729.

## B. Standing

The doctrine of standing is a justiciability doctrine[14] that guides a court in determining "whether a particular litigant is entitled to have the court decide the merits of his or her dispute." Case v. Wilmington Tr., N.A., 703 S.W.3d 274, 281 (Tenn. 2024); see also Warth v. Seldin, 422 U.S. 490, 498 (1975). It "precludes courts from adjudicating an action at the instance of one whose rights have not been invaded or infringed." Wilmington Tr., 703 S.W.3d at 281 (quoting Am. C.L. Union of Tenn. v. Darnell, 195 S.W.3d 612, 619 (Tenn. 2006)); see also Warth, 422 U.S. at 498-99 (identifying the standing question as "whether the plaintiff has 'alleged such a personal stake in the outcome of the controversy' as to warrant" invocation of the court's jurisdiction (quoting Baker v. Carr, 369 U.S. 186,

---

33 S.W.3d 727, 729 (Tenn. 2000). It carries with it certain attributes, among them that defects cannot be waived, forfeited, or excused for equitable reasons, and they may be raised at any time before final judgment. Ins. Corp. of Ir. v. Compagnie des Bauxites de Guinee, 456 U.S. 694, 702 (1982); Meighan v. U.S. Sprint Commc'ns Co., 924 S.W.2d 632, 639 (1996); see also Tenn. R. Civ. Proc. 12.08. In this opinion, we also will use the shorthand term "jurisdictional" to refer to legal principles that implicate the court's adjudicatory authority, such that they are not subject to waiver or forfeiture.

[13] Courts often use the words waiver and forfeiture interchangeably. Kontrick v. Ryan, 540 U.S. 443, 458 n.13 (2004). However, there is a distinction. "Whereas forfeiture is the failure to make the timely assertion of a right, waiver is the 'intentional relinquishment or abandonment of a known right.'" United States v. Olano, 507 U.S. 725, 733 (1993) (quoting Johnson v. Zerbst, 304 U.S. 458, 464 (1938)). We endeavor here to use the term that is correct under the circumstances of this case—forfeiture—although we acknowledge that the language of the courts below and much of the authority cited in this opinion refers to waiver.

[14] Justiciability doctrines, of which standing is just one, help a court to determine whether a particular case presents a legal controversy appropriate for the court's adjudication. Norma Faye Pyles Lynch Fam. Purpose LLC v. Putnam Cnty., 301 S.W.3d 196, 203 (Tenn. 2009).

204 (1962))). The standing inquiry may turn on the nature of the claim, but it is distinct from any inquiry into the merits of the claim. Wilmington Tr., 703 S.W.3d at 281.

This Court has divided the doctrine of standing into two categories: constitutional standing and non-constitutional standing, often referred to as prudential standing. Id. at 281 (citing City of Memphis v. Hargett, 414 S.W.3d 88, 98 (Tenn. 2013)); cf. Warth, 422 U.S. at 498 (identifying the same categories under federal jurisprudence). In addition, non-constitutional or prudential standing historically has been divided further into at least "the general prohibition on a litigant's raising another person's legal rights, the rule barring adjudication of generalized grievances more appropriately addressed in the representative branches, and the requirement that a plaintiff's complaint fall within the zone of interests protected by the law invoked." E.g., Elk Grove Unified Sch. Dist. v. Newdow, 542 U.S. 1, 12 (2004) (quoting Allen v. Wright, 468 U.S. 737, 751 (1984)). These latter concepts historically have referred to judicially self-imposed (i.e., prudential) limitations on the exercise of adjudicatory authority rather than constitutionally based limitations.[15]

Despite its seemingly straightforward purpose, the doctrine of standing has proven challenging for courts to decipher and apply. See, e.g., Flast v. Cohen, 392 U.S. 83, 98–99 (1968) (recognizing the "amorphous" nature of the doctrine due to the "complexities and vagaries that inhere in justiciability"). See generally F. Andrew Hessick, Standing, Injury in Fact, and Private Rights, 93 Corn. L. Rev. 275, 276 (2008) ("Although seemingly simple on its face, this doctrine has produced an incoherent and confusing law of federal courts."); William A. Fletcher, The Structure of Standing, 98 Yale L.J. 221, 290 (1988) ("The law of standing cannot be made easy."). As suggested above, some of the difficulties may stem from the multi-faceted nature of the doctrine.

This case represents a prime example. In light of this Court's instructions in the order granting review, the Defendant argues in this Court that the Plaintiffs lacked constitutional standing to bring their suit. Of course, the trial court addressed the Defendant's standing challenge through what it characterized as statutory standing principles. Not surprisingly, then, the Defendant also maintains in this Court that the Plaintiffs lacked statutory standing to pursue their claims. Lastly, for their part, the Plaintiffs contend that the Court of Appeals was correct in concluding that the Defendant's challenge actually implicates shareholder standing limitations. Clearly, then, we must confront multiple facets of the standing doctrine to resolve this appeal.

---

[15] In recent years, the proper characterization of some of these concepts has been reconsidered. See, e.g., Lexmark Intern., Inc. v. Static Control Components, Inc., 572 U.S. 118, 127, 128 n.4 (2014) (clarifying that the zone-of-interests concept is not truly a matter of prudential standing but rather a matter of statutory interpretation); Lujan v. Defenders of Wildlife, 504 U.S. 555, 573–74 (1992) (clarifying that "raising only a generally available grievance about government" implicates constitutional rather than prudential limitations). In this appeal, we address only certain aspects of the standing doctrine, as detailed below. Beyond those aspects, we offer no opinion as to the proper characterization of any concepts historically classified under the rubric of prudential standing.

## C. Constitutional Standing

We first address whether the Plaintiffs lacked constitutional standing. Constitutional standing has been referred to as "one of the 'irreducible . . . minimum' requirements that a party must meet in order to present a justiciable controversy." City of Memphis, 414 S.W.3d at 98 (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992)). Until recently, Tennessee courts generally looked to the well-known federal standard for evaluating constitutional standing. See, e.g., id. The federal constitutional standard incorporates three elements: (1) injury in fact; (2) a causal connection between the alleged injury and the challenged conduct; and (3) an injury capable of being redressed by a favorable decision of the court. See, e.g., Lujan, 504 U.S. at 560–61.

Just last year, however, we more carefully examined the doctrine of standing under the Tennessee Constitution. Wilmington Tr., 703 S.W.3d at 286–91. Among other concepts, we analyzed the Open Courts Clause of the Tennessee Constitution, which provides, in pertinent part: "That all courts shall be open; and every man, for an injury done him in his lands, goods, person or reputation, shall have remedy by due course of law . . . ." Tenn. Const. art. I, § 17. Based on this language, we observed "that our constitution guarantees access to the courts and remedy for every injury to one's 'lands, goods, person or reputation.'" Wilmington Tr., 703 S.W.3d at 288 (quoting Tenn. Const. art. I, § 17).

Furthermore, we noted a distinction between cases involving private rights and those involving public rights, and we departed significantly from the federal standard for cases involving private rights. Id. at 288, 291. In particular, we held "that all claims must allege an 'injury.' In private rights claims, injury in law is sufficient. In public rights claims, there must also be an injury in fact, in addition to the causation and redressability elements." Id. at 291. In other words, a plaintiff suing over violation of a private right "need not allege a concrete injury in fact in addition to a legal injury." Id. at 288 n.12. Instead, for private rights cases, "an injury done him" under Article I, Section 17 means an injury in law, regardless of the presence or absence of damages. Id. at 287.

An injury in law, in turn, consists of "a violation of [the plaintiff's] legal rights in some way, or a violation of law that affect[s] him adversely." Id. (quoting Barnes v. Kyle, 306 S.W.2d 1, 3 (Tenn. 1957)). Stated another way, to have standing, the concept of an injury in law requires a plaintiff to assert injury to a legal interest guaranteed "under constitutional, statutory, or common law." Id. at 287.

Against this legal backdrop, we first must determine whether this case involves private rights or public rights. Distinguishing between the two categories is not always straightforward. See, e.g., Kennestone Hosp., Inc. v. Emory Univ., 897 S.E.2d 772, 779 n.3 (Ga. 2024) (noting that "[t]he case law and scholarship wrestling with how to define these categories is substantial"). Here, however, we need not precisely define the contours of the two categories to arrive at our conclusion that this case involves private rights.

The Plaintiffs and the Defendant are private parties. Their dispute arose from the failure of a private business arrangement. The Plaintiffs brought common law causes of action seeking compensatory and punitive damages for alleged tortious injury to their private property interests, namely "the destruction of their business, the loss of their livelihood, the loss of the value of their stock, and the loss of their personal assets to the extent invested in the business." From these circumstances, we conclude that this case clearly involves private rights. See Wilmington Tr., 703 S.W.3d at 291–92. Thus, the proper standard to evaluate constitutional standing in this case is the one applicable to private rights cases. See id. at 292.

When the parties filed their briefs in this Court, we had not released Wilmington Trust. Not surprisingly, the Defendant's argument in its brief focused on the three-part federal constitutional standard that we later departed from in Wilmington Trust. However, after Wilmington Trust was released, we instructed the parties to address the question of constitutional standing at oral argument in light of Wilmington Trust. Order, Houghton v. Malibu Boats, LLC, No. E2023-00324-SC-R11-CV (Tenn. Dec. 23, 2024) (requesting "that the parties be prepared to address at oral argument whether Plaintiffs have constitutional standing under [Wilmington Trust]").

Drawing from Wilmington Trust, the Defendant now argues that the flaw in the Plaintiffs' constitutional standing is the lack of an injury in law. The Defendant's focus is on our observation that the Tennessee Constitution "guarantee[s] access to the courts and remedy *only for injuries to legal rights cognizable under constitutional, statutory, or common law*." Wilmington Tr., 703 S.W.3d at 287 (emphasis added). The Defendant contends that although the Plaintiffs may have had a cognizable legal right in the form of their ownership interest in Great Wakes, they suffered no damage in that regard. Instead, to the extent the Defendant's alleged tortious conduct caused damage—the loss of equity in the Real Properties—it implicated no cognizable legal right because the Plaintiffs had no interest in the Real Properties. In this way, the Defendant seizes upon the concept of *damnum absque injuria*, "an ancient maxim, that a damage to one, without an injury [in law] . . . does not lay the foundation of an action." Id. (quoting Ala. Power Co. v. Ickes, 302 U.S. 464, 479 (1938)); see also Tenn. Elec. Power Co. v. Tenn. Valley Auth., 306 U.S. 118, 137 (1939) (noting that "a damage not consequent upon the violation of any right recognized by law," *damnum absque injuria*, "is not the basis of a cause of action"); Hessick, supra, at 280–81 (explaining that historically in private rights cases, "[a] factual harm without a legal injury was damnum absque injuria and provided no basis for relief").

The Defendant's argument on this issue is unpersuasive. We begin by reiterating that Tennessee law recognizes certain private legal rights, among them property rights. See William C. Koch, Jr., Reopening Tennessee's Open Courts Clause: A Historical Reconsideration of Article I, Section 17 of the Tennessee Constitution, 27 U. Mem. L. Rev. 333, 362 n.189 (1997) (citing 1 William Blackstone, Commentaries *129, *134, *138); see also Tenn. Const. art. I, § 17 (speaking to redress for injuries done to "lands, goods, person or reputation"). In this case, the Plaintiffs were the two sole shareholders of Great Wakes.

- 13 -

Their stock (ownership of Great Wakes) clearly represented a cognizable private property right. The value of the Plaintiffs' stock rested upon the value of Great Wakes, and the value of Great Wakes depended in part upon the value of its assets, such as the Real Properties.[16] The Defendant's alleged tortious conduct entailed the invasion of this legally protected ownership interest—that is to say, an injury in law.

Based on the Defendant's alleged tortious misrepresentations and concealment of pertinent facts, the Plaintiffs brought recognized common law causes of action. See T.P.I.—Civil §§ 8.36 (identifying the elements of intentional misrepresentation), 8.38 (identifying the elements of fraudulent concealment or misrepresentation by concealment), 8.41 (identifying the elements of promissory fraud). Tennessee circuit courts exercise general jurisdiction and, with certain exceptions inapplicable to this case, have the authority to hear civil common law cases. See Tenn. Code Ann. § 16-10-101 (2021). Considering all of the above circumstances, we conclude that the Plaintiffs have constitutional standing under the standard set forth in Wilmington Trust for private rights cases. See Franchise Tax Bd. v. Alcan Aluminum Ltd., 493 U.S. 331, 336 (1990) (concluding that "lowering the value of . . . stockholdings" constituted a sufficient injury to convey constitutional standing, even under the federal injury-in-fact standard); Pike v. Tex. EMC Mgmt., LLC, 610 S.W.3d 763, 778 (Tex. 2020) (concluding that a "stakeholder in a business organization has constitutional standing to sue for an alleged loss in the value of its interests in the organization"). Whether the circumstances in this case offend other facets of the doctrine of standing remains to be seen.

## D. Statutory Standing

We next address the basis of the trial court's decision to dismiss the Plaintiffs' lawsuit, a lack of so-called "statutory standing." This Court has stated that "[w]hen a statute creates a cause of action and designates who may bring an action, the issue of standing is interwoven with that of subject matter jurisdiction and becomes a jurisdictional prerequisite." Estate of Smallman, 398 S.W.3d at 149 (quoting Osborn, 127 S.W.3d at 740). The question of whether a person falls within the class of plaintiffs whom the legislature has authorized to sue under a statute is referred to sometimes as "statutory standing."[17] Lexmark Int'l, Inc. v. Static Control Components, Inc., 572 U.S. 118, 128 n.4 (2014) (citing Steel Co. v. Citizens for Better Env't, 523 U.S. 83, 97 & n.2 (1998)). In this

---

[16] As we detailed above, because the Plaintiffs' expert evidence on the value of Great Wakes did not address the Real Properties, the Plaintiff offered different evidence as to their value. Given these circumstances, the verdict form contained separate lines for diminution in value of the business and loss of equity in the dealership buildings. However, we do not believe this fact renders the value of Great Wakes dissociated from the value of the Real Properties for purposes of evaluating the Plaintiffs' constitutional standing.

[17] We note that the United States Supreme Court recently raised questions about the proper categorization of this concept. See Lexmark, 572 U.S. at 128 n.4. Because we conclude that the concept is wholly inapplicable under the circumstances of this case, we have no occasion to address its place within the doctrine of standing in Tennessee.

case, the Defendant argues that the Plaintiffs lacked statutory standing to pursue their claims, pointing to established provisions of corporate law in Tennessee.

Tennessee corporations ordinarily have the power to "[s]ue and be sued, complain and defend in the corporate name." Tenn. Code Ann. § 48-13-102(1) (2019). Because "a corporation and its shareholders are distinct entities," Cambio Health Sols., LLC v. Reardon, 213 S.W.3d 785, 790 (Tenn. 2006), the responsibility for determining whether to sue lies with the corporation, not its shareholders, Lewis ex rel. Citizens Sav. Bank & Trust Co. v. Boyd, 838 S.W.2d 215, 220 (Tenn. Ct. App. 1992). Relatedly, as a general matter, "the proper party to bring a claim on behalf of a corporation is the corporation itself." Keller, 495 S.W.3d at 867.

As the Defendant points out, however, Tennessee law provides an alternative that is available under certain limited circumstances. See id. That alternative is the derivative proceeding, an "equitable remedy available to shareholders when a corporate cause of action is, for some reason, not pursued by the corporation itself." Lewis, 838 S.W.2d at 221; see Tenn. Code Ann. § 48-17-401; see also Tenn. R. Civ. Proc. 23.06. The statute limits who may commence such a proceeding, see Tenn. Code Ann. § 48-17-401(a) (identifying certain shareholders), and imposes certain other requirements, see Tenn. Code Ann. § 48-17-401(b) (setting forth verification and demand requirements). See also Tenn. R. Civ. Proc. 23.06.

The Defendant seized upon these concepts in the trial court, arguing that the claims pursued by the Plaintiffs—and the resulting damages awarded for the loss of equity in the Real Properties—belonged to Great Wakes. The Defendant argued that the Plaintiffs, as shareholders, could pursue the asserted claims only through a derivative proceeding, which would provide a pathway to standing. However, because the Plaintiffs did not comply with the applicable statutory requirements, see Tenn. Code Ann. § 48-17-401(b), the Plaintiffs failed to acquire standing to bring their suit. Furthermore, relying on Estate of Smallman, the Defendant argued that it had not forfeited its challenge because it was "interwoven with that of subject matter jurisdiction."[18] 398 S.W.3d at 149; see also Tenn. R. Civ. Proc. 12.08 (stating that "whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action"). The trial court ultimately agreed with the Defendant and dismissed the Plaintiffs' suit.

Before this Court, the Defendant maintains that the Plaintiffs lacked the requisite statutory standing to pursue their asserted claims. However, like the Court of Appeals, we conclude that this argument is wholly inapposite. See Houghton, 2024 WL 1598815, at *6. Simply put, the Plaintiffs did not pursue a derivative proceeding. Therefore,

---

[18] The Plaintiffs did not challenge the Defendant's characterization of Tennessee Code Annotated section 48-17-401 as a "statute creat[ing] a cause of action." Estate of Smallman, 398 S.W.3d at 149. Given our resolution of this issue, we do not consider whether the statute—and the requirements of section 48-17-401(b)—fall within the ambit of the jurisdictional principle articulated in Estate of Smallman.

- 15 -

unsurprisingly, it is not disputed that the Plaintiffs did not comply with the requirements set forth in Tennessee Code Annotated section 48-17-401.

Instead, the Plaintiffs filed suit for alleged intentional torts, apparently believing that they had individual rather than derivative claims. This course of action is permitted by Tennessee law. Although it is true that in most instances, "the proper party to bring a claim on behalf of a corporation is the corporation itself," Keller, 495 S.W.3d at 867 (quoting House v. Estate of Edmondson, 245 S.W.3d 372, 381 (Tenn. 2008)), a "stockholder who is directly injured . . . retain[s] the right to bring an individual action for injuries affecting his or her legal rights as a stockholder," id. at 868–69 (quoting Tooley v. Donaldson, Lufkin, & Jenrette, Inc., 845 A.2d 1031, 1036 (Del. 2004)). Such an action is permitted even if the corporation also may have a cause of action growing out of the same wrong. Id. at 868; see also Franchise Tax Bd., 493 U.S. at 336 (permitting "a shareholder with a direct, personal interest in a cause of action to bring suit even if the corporation's rights are also implicated"); 12B Fletcher Cyc. Corp. § 5911 (September 2024 update) (stating that under certain circumstances, "[a]n individual cause of action can be asserted when the wrong is both to the shareholder and the corporation").

Thus, we conclude that the Defendant's attempt to cabin its argument in statutory standing principles related to a derivative proceeding under Tennessee Code Annotated section 48-17-401 is unpersuasive. However, this is not to say that the substance of the Defendant's argument finds no place in our analysis of standing.

*E. Shareholder Standing*

As previously mentioned, we have recognized a non-constitutional category of the doctrine of standing, often referred to as prudential standing. Wilmington Tr., 703 S.W.3d at 281 (citing City of Memphis, 414 S.W.3d at 98); cf. Warth, 422 U.S. at 498. Among the concepts included in the category of prudential standing is that "a party 'generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties.'" Kowalski v. Tesmer, 543 U.S. 125, 129 (2004) (quoting Warth, 422 U.S. at 499); see also Wilmington Tr., 703 S.W.3d at 282. This limitation speaks to a concept commonly referred to as third-party standing. The limitations associated with third-party standing provide "the assurance that the most effective advocate of the rights at issue is present to champion them." Duke Power Co. v. Carolina Env't Study Grp., Inc., 438 U.S. 59, 80 (1978).

"Related to this principle . . . is the so-called shareholder standing rule." Franchise Tax Bd., 493 U.S. at 336. "[T]he rule is a longstanding equitable restriction that generally prohibits shareholders from initiating actions to enforce the rights of the corporation unless the corporation's management has refused to pursue the same action for reasons other than good-faith business judgment." Id. However, this restriction has an exception "allowing a shareholder with a direct, personal interest in a cause of action to bring suit even if the corporation's rights are also implicated." Id.

- 16 -

We examined shareholder standing in Keller, 495 S.W.3d at 867, and we recognized the concept that a "stockholder who is directly injured . . . retain[s] the right to bring an individual action for injuries affecting his or her legal rights as a stockholder."[19] Id. at 868–69 (quoting Tooley, 845 A.2d at 1036). We observed that the identifying nature of a shareholder's individual direct action "is not hard to state in general terms." Id. at 869. "Generally, '[i]f the injury is one to the plaintiff as a shareholder as an individual, and not to the corporation, . . . it is an individual[, i.e., direct] action.'" Id. (alterations in original) (quoting 12B Fletcher Cyc. Corp. § 5911). However, we also recognized in Keller the need for an analytical framework to aid in the evaluation of borderline cases in which injuries suffered by shareholders mirror or overlap injuries suffered by the corporation. Id.

Thus, in Keller, we adopted the framework set forth by the Delaware Supreme Court in Tooley. Keller, 495 S.W.3d at 877. Under that framework, to determine whether a plaintiff is pursuing a direct action, "a court should look to the nature of the wrong and to whom the relief should go." Keller, 495 S.W.3d at 875 (quoting Tooley, 845 A.2d at 1039). The issue turns on the following questions: "(1) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)?" Id. (quoting Tooley, 845 A.2d at 1033).

The substance of the Defendant's standing challenge implicates these principles. The Plaintiffs purported to bring an individual action, alleging direct injury, against the Defendant. However, because Great Wakes owned the Real Properties, the Defendant contends that the Plaintiffs "[were] not attempting to recover 'for an injury done directly to them.'" Instead, the Defendant argues that under the Keller framework, it was Great Wakes that suffered the alleged harm and, thus, the Plaintiffs were not directly injured by the loss of equity in the Real Properties. Therefore, the Defendant asserts that shareholder standing limitations preclude "the [Plaintiffs'] attempts to recover for loss of equity in the Real Property owned by [Great Wakes]."[20]

The primary response of the Plaintiffs is not a substantive defense based on shareholder standing principles. In fact, the Plaintiffs candidly indicated in their brief and at oral argument before this Court that, under the record in this case, the Defendant may have had a persuasive argument that the Plaintiffs failed to state a claim upon which relief could be granted. However, the Plaintiffs contend that the Defendant's argument is of no consequence because the Defendant forfeited the issue by raising it for the first time during

---

[19] We emphasize that our use of "shareholder standing" in this opinion refers to this principle rather than standing to pursue a shareholder derivative proceeding.

[20] Of course, the Defendant contends primarily that shareholder standing principles are not determinative, and instead the Plaintiffs lack standing based on constitutional and statutory standing principles.

the hearing on its motion for judgment notwithstanding the verdict. Accordingly, we critically must consider the question of forfeiture under these circumstances.

*F. Forfeiture of Shareholder Standing Issue*

The forfeiture question in this case necessarily entails two separate inquiries. First, we must determine whether shareholder standing limitations are jurisdictional. In other words, we must determine whether shareholder standing issues are subject to forfeiture or waiver in the first place. Second, if shareholder standing issues are subject to forfeiture or waiver, we must determine whether the record in this case reflects forfeiture.

We begin with the determination that shareholder standing limitations lie within the non-constitutional or prudential category of the doctrine of standing. See Franchise Tax Bd., 493 U.S. at 336. Prudential standing, in contrast to constitutional standing, is grounded in self-imposed rules of judicial restraint. Wilmington Tr., 703 S.W.3d at 282; Allen, 468 U.S. at 751. The distinction is significant, particularly in that prudential standing issues historically have not been considered jurisdictional. In fact, this Court plainly has held that "[o]rdinarily, issues of non-constitutional standing are not essential to subject matter jurisdiction and are waived if not properly preserved." City of Memphis, 414 S.W.3d at 98 n.8.

Nevertheless, the Defendant urges us to find shareholder standing principles to be rooted in constitutional standing and, therefore, jurisdictional. The Defendant points us to a recent decision from Georgia, Wasserman v. Franklin County, 911 S.E.2d 583 (Ga. 2025), in which the Georgia Supreme Court examined "whether a plaintiff may properly rely on the federal doctrine of third-party standing to establish constitutional standing in Georgia courts." Id. at 589. The Georgia Supreme Court "conclude[d] that our current Constitution's grant of the judicial power to Georgia courts does not include the power to adjudicate a plaintiff's claim asserting only the rights of parties not before the Court." Id. at 601.

A close analysis of Wasserman leads us to conclude that the case before us presents a different issue. Wasserman addressed a question involving challenged conduct that violated "*only* a third party's legal rights." Id. at 591 (emphasis added). In particular, the plaintiff pursued a claim against a governmental entity, asserting a violation of a third party's equal protection rights. Id. at 588–89. The Georgia Supreme Court concluded that the plaintiff could not rely on federal third-party standing doctrine to impart constitutional authority for the Georgia court to decide whether the rights of the third party were violated.[21] Id. at 600–01.

---

[21] We note that the place of third-party standing concepts in federal standing doctrine was the subject of some speculation not long ago. See Lexmark, 572 U.S. at 127 n.3. More recently, the United States Supreme Court re-affirmed that third-party standing concepts are prudential for purposes of the federal doctrine of standing, and thus, they may be waived or forfeited. June Med. Servs. LLC v. Russo, 591 U.S. 299, 317 (2020); id. at 354 n.4 (Roberts, C.J., concurring in the judgment).

By contrast, the shareholder standing issue in this case does not entail a claim involving challenged conduct that allegedly violated only a third party's legal rights.[22]  As we established above when addressing the issue of constitutional standing, the Defendant's allegedly tortious conduct violated the Plaintiffs' judicially cognizable legal rights, even if it also violated the legal rights of Great Wakes.  Furthermore, the Defendant's conduct, even if it injured Great Wakes, also injured the Plaintiffs through a diminution in the value of their stock.

Given the circumstances of this case, we find Potter v. Cozen & O'Connor, 46 F.4th 148 (3d Cir. 2022), to be more instructive than Wasserman.  Potter specifically addressed shareholder standing principles and held "that the shareholder standing rule is non-jurisdictional, implicating only a plaintiff's power to bring claims, not the Court's power to hear them."  Id. at 155.  The court observed that the challenged conduct in that case inflicted a financial injury on the corporate entities, but it also inflicted an injury on the shareholders, "the diminution of value in their ownership interests," which satisfied constitutional standing requirements.  Id. at 157.  The court also noted that the very nature of the injury to shareholders in a derivative context confirms that, even when they are barred from suit under shareholder standing limitations as a prudential matter, those shareholders have constitutional standing.  Id.  Thus, shareholder standing deficiencies go to the merits rather than the authority of the court to adjudicate the dispute, and they may be challenged for failure to state a claim rather than a lack of jurisdiction.  Id.; see also Culverhouse v. Paulson & Co., 813 F.3d 991, 994 (11th Cir. 2016) (concluding that purportedly individual, direct claims that actually are derivative are subject to challenge for failure to state a claim rather than for a lack of jurisdiction); Pike, 610 S.W.3d at 778 (concluding that a "stakeholder in a business organization has constitutional standing to sue for an alleged loss in the value of its interest in the organization," and limitations associated with damages go to the merits of the claim rather than subject matter jurisdiction).

The Defendant nonetheless attempts to limit the reach of the principles at play in Potter, suggesting that "[a]t best, Potter stands for the proposition that whether shareholders can pursue 'loss of value in the company' damages is a question of prudential standing." In a familiar refrain, the Defendant contends that this case is different—and does not rest upon prudential standing concepts—because the damages at issue were the loss of equity in the Real Properties rather than the loss of value in Great Wakes.

However, we find the Defendant's point to be a distinction without a difference. Great Wakes owned the Real Properties.  As such, these assets were part of the value of Great Wakes just as much as its inventory, cash on hand, or accounts payable.  As we detailed above, the separate line on the verdict form for "loss of equity in dealership

---

[22] Because this case does not present the same issue as Wasserman, we have no occasion to consider here whether a pure third-party standing issue is constitutional or prudential in nature.

- 19 -

buildings" was a function of the fact that the Plaintiffs' expert did not include the Real Properties when arriving at a figure for the value of Great Wakes. This circumstance does not render the damage in this case qualitatively different from that in Potter. Thus, it does not impact our conclusion that Potter provides persuasive guidance on the question of whether shareholder standing limitations are jurisdictional.[23]

Accordingly, we conclude that the shareholder standing issue in this case goes to the merits rather than the authority to adjudicate the suit. Jurisdiction in this case is not defeated by the possibility that the Plaintiffs might have failed to state a claim upon which they actually could recover. See Bell v. Hood, 327 U.S. 678, 682 (1946); see also Lexmark, 572 U.S. at 128 n.4 (recognizing that "the absence of a valid (as opposed to arguable) cause of action does not implicate subject-matter jurisdiction, *i.e.*, the court's statutory or constitutional *power* to adjudicate the case" (quoting Verizon Md. Inc. v. Pub. Serv. Comm'n of Md., 535 U.S. 635, 642–53 (2002))). The substance of the Defendant's issue is non-constitutional or prudential in nature, and, therefore, the issue is subject to forfeiture.

Having concluded that any shareholder standing defect in this case is subject to forfeiture, we next address whether the Defendant, in fact, did forfeit the issue. As we explained above, shareholder standing limitations do not implicate subject matter jurisdiction. Thus, a shareholder standing challenge is not properly pursued through a motion under Rule 12.02(1) of the Tennessee Rules of Civil Procedure. Instead, the issue may be raised in a variety of other ways, for instance by a "specific denial or defense (but not an affirmative defense under Rule 8.03) in the answer or responsive pleading, or by a motion to dismiss under Rule 12.02(6) or in proper cases by a motion for judgment on the pleadings under Rule 12.03, or motion to strike under Rule 12.06." Knierim v. Leatherwood, 542 S.W.2d 806, 808 (Tenn. 1976).

These various methods confirm that, unlike an issue implicating subject matter jurisdiction, a challenge based on shareholder standing limitations may not be raised at any time. Instead, a shareholder standing issue certainly could be raised during the pleadings or pre-trial-motions stage of an action and, depending on the circumstances, potentially through the trial stage of the action.[24] Clearly, however, an issue based on shareholder standing limitations that is presented after the close of trial is forfeited. See Tenn. R. Civ. Proc. 12.08 (stating that challenges for failure to state a claim upon which relief can be granted may be made through certain pre-trial methods or "at the trial on the merits"); see

---

[23] We also observe that nowhere in the extensive treatment of shareholder standing in Keller did this Court intimate that the limitations were jurisdictional.

[24] We note that in Keller—a case involving shareholder standing issues—the relevant party first challenged standing in a pre-trial brief and later renewed the challenge in the context of a motion for involuntary dismissal once the opposing party's proof was complete. The challenge was timely under the circumstances of that case. In re Estate of McRedmond, No. M2013-02582-COA-R3-CV, 2014 WL 6324283, at *21 (Tenn. Ct. App. Nov. 14, 2014), rev'd in part on other grounds sub nom. Keller v. Estate of McRedmond, 495 S.W.3d 852 (Tenn. 2016).

also <u>Yarbrough v. Stiles</u>, 717 S.W.2d 886, 888 (Tenn. Ct. App. 1986) (concluding that the defendants forfeited their real-party-in-interest issue under Rule 17.01 of the Tennessee Rules of Civil Procedure "by failing to raise the issue in their pleadings or properly at any stage of the trial"); <u>cf.</u> 5C <u>Wright & Miller's Federal Practice & Procedure</u> § 1392, at 530 (3d ed. 2004) (discussing analogous conclusion regarding Rule 12(h)(2) of the Federal Rules of Civil Procedure).

In this case, the complaint made reasonably clear the nature of the relationship between the Plaintiffs, the Defendant, and Great Wakes, as well as the Plaintiffs' theory of damages. The Defendant asserted generally in its answer a defense that the Plaintiffs' complaint failed to state a claim upon which relief could be granted, and the Defendant filed multiple pre-trial motions to dismiss asserting the same basis for dismissal. At no point in these filings, however, did the Defendant articulate an argument based on standing.

Later in the litigation, but before trial, the Defendant moved to exclude the Plaintiffs' expert evidence on the valuation of Great Wakes and proposed certain related jury instructions. These filings revolved around the issue of what damages the Plaintiffs had suffered. However, at no point did the Defendant relate its issues about the proper measure of damages to the question of standing.

Similarly, at trial, the Defendant identified issues regarding the proper measure of any damages in its motion for a directed verdict after the close of the Plaintiffs' proof. However, the Defendant mainly focused on questions about the appropriate time periods for any such calculation rather than standing. Furthermore, during the discussion with the trial court on the Defendant's motion for a directed verdict, which blended into the final discussion of the jury charge and verdict form, the Plaintiffs suggested including a line on the verdict form for loss of equity in the dealership buildings, separate from the line for diminution of value of the business. This circumstance forms the basis for the Defendant's later standing challenge. During the discussion at trial, however, although the Defendant raised multiple issues regarding any damages pertaining to the Real Properties, at no point did the Defendant articulate anything resembling the later standing argument.

As a result, based on our review, we agree with the Court of Appeals' assessment that the record reflects that the Defendant did not raise its standing issue until after the jury returned its verdict. We conclude that the Defendant's challenge was untimely. <u>See</u> <u>Black, Sivalls & Bryson, Inc. v. Shondell</u>, 174 F.2d 587, 590–91 (8th Cir. 1949) (stating that an objection for failure to state a claim may not be made for the first time in a motion for judgment notwithstanding the verdict). Thus, the Defendant forfeited any issue based on shareholder standing limitations.

### III. CONCLUSION

In summary, we conclude that the Plaintiffs had constitutional standing to bring their suit. We further conclude that the Plaintiffs' suit did not implicate statutory standing

principles and that the Defendant forfeited any issue based on shareholder standing principles. Accordingly, we affirm the judgment of the Court of Appeals reversing the trial court's dismissal of the Plaintiffs' suit. We remand to the trial court for consideration of the remaining issues in the Defendant's post-trial motion and for further proceedings consistent with this opinion.

The costs of this appeal are taxed to the appellant, Malibu Boats, LLC, and its surety, for which execution may issue if necessary.

_____
JEFFREY S. BIVINS, CHIEF JUSTICE